In re Lorraine MOCCO, et al., Debtor.

Peter MOCCO and Village Townhouse Estates, Inc., Plaintiffs,

v.

CITY OF JERSEY CITY, Defendant.

Bankruptcy No. 94–31932.
Adversary No. 94–3333.

United States Bankruptcy Court,
D. New Jersey.

July 1, 1998.

James A. Scarpone, Philip Lindeman II, Hellring Lindeman Goldstein & Siegal, Newark, NJ, for Debtor.

Joseph M. Andresini, Andora, Palmisano & Geaney, Elmwood Park, NJ, for City of Jersey City.

## OPINION

WILLIAM H. GINDIN, Chief Judge.

### PROCEDURAL BACKGROUND

This matter comes before the court as an adversarial proceeding commenced on July 13, 1994 by notice of removal to this Court by debtors Peter Mocco and Village Townhouse Estates, Inc. (together, the "debtors") against the City of Jersey City (the "City"), to determine, modify and reduce the amount of real property tax, pursuant to 11 U.S.C. § 505(a)(2)(A).

The debtors contend that the City's valuations of the debtors' real property located in the City of Jersey City have, for the tax years 1986 through 1996, materially overstated the full and fair market value of such property. As such, the debtors argue that they have overpaid property tax obligations to the City for those years, and seek the amount they claim they have overpaid in damages.

The City disputes the debtors' claims and asserts that the assessments made upon the debtors' property were at their full and fair value and that taxes on the property were assessed in a manner substantially similar to other like real property within the city of Jersey City.

The court held plenary hearings on May 23, 1996, July 2, 1996, September 11, 1996 and August 28–29, 1997, during which hearings, witnesses testified for both sides and evidence was entered into the record. The debtors submitted a post-hearing brief on January 5, 1998; the City submitted its brief on January 7, 1998.

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. §§ 157(a)(2)(A), (B) and (O).

### FACTUAL FINDINGS

#### 1. The Parties

Peter Mocco, the plaintiff and the debtor herein, is and was during all relevant times a real estate developer in the State of New Jersey. Village Townhouse Estates, Inc. is another plaintiff and debtor in this adversary proceeding; however, it is not a significant party in this decision as trial went forward only on those parcels relating to Peter Mocco. Liberty Harbor Marina, Inc. is a New Jersey corporation ("LHMI") owned one hundred percent by Lorraine Mocco, also a debtor in this case, and the wife of Peter Mocco. LHMI owns various parcels described below, which comprise the marina enterprise, by virtue of an Agreement of Sale dated January 20, 1990, wherein Peter Mocco conveyed the marina to LHMI. Pursuant to an undated post-nuptial agreement between Mr. and Mrs. Mocco, Peter Mocco has a forty year lease on the LHMI premises. The post-nuptial agreement also provides that Mr. Mocco is responsible for real estate taxes in excess of $42,000 for tax years 1990 through 1995 and for all real estate taxes in 1996. In addition that agreement provides

that "over-paid" taxes are property of Peter Mocco if he is successful on tax appeal.[1]

## 2. The Subject Property

The property which is the subject of the instant dispute consists of two parcels: (i) 18.09 acres of land (described on the tax maps of Jersey City as Block 60, Lots 21D, 22B, 23A, 24B, 25H) owned by debtor Peter Mocco, and (ii) an additional 25.92 acres of land (described on the tax maps of Jersey City as Block 60, Lots 26A, 26B, 27, 27B, 27D and 41) owned by Liberty Harbor Marina, Inc. (collectively, the "Subject Property"). The LHMI parcels are improved with a 96 slip marina constructed in 1991 which was expanded to 110 slips in 1993 and various out-buildings. *See Appraisal of Charles Blau* (the "Blau Appraisal") at 2; *Appraisal of Michael Hiller* (the "Hiller Appraisal") at 15. The Subject Property is situated in the Liberty Harbor North Redevelopment Zone, which is located in the City of Jersey City. *Id.*

### (a) History of the Subject Property

Historically, the land upon which the Subject Property is situated was, for the most part, owned by the railroads and used for industrial purposes. *Blau Appraisal at 18.* As early as 1966, the City of Jersey City began planning a redevelopment of the area, and in 1973, it formulated the Liberty Harbor North Redevelopment Plan (the "Redevelopment Plan") to promote residential development and other improvements to the industrialized downtown area. *Id. at 24.* Pursuant to the Redevelopment Plan, the area containing the Subject Property was incorporated into the "Liberty Harbor North Redevelopment Zone" (the "Redevelopment Zone"). *Blau Appraisal at 24; Amendment to the City of Jersey City's Liberty Harbor North Redevelopment Plan, dated March 2, 1983* (the "Amended Redevelopment Plan"). In 1983, the Redevelopment Plan was amended to provide more favorable development regulations which sought to encourage residential development in the Redevelopment Zone and to further redevelop the blighted industrial areas. *Id.*

By 1983, the seventy-five acres containing the Subject Property were owned by the Employees Retirement System of Jersey City (the "ERS"). *Tr. 9/11/96, p. 61.* The ERS thereafter engaged the Jersey City Redevelopment Agency (the "JCRA") to act as its agent for the marketing and sale of this seventy-five acres to potential redevelopers. *Id.* The property was actively marketed through 1984 and 1985, and during that time frame, was the subject of several serious inquiries by potential purchasers, among them United Pacific Corporation. *Id.* Peter Mocco had also become interested in the Subject Property. *Id.*

### (b) Peter Mocco's Acquisition of the Subject Property

On February 14, 1985, Peter Mocco entered into a "Contract for Sale of Land for Private Development" with the JCRA whereby JCRA was obligated to: (i) assist in the sale of the Subject Property by ERS to Peter Mocco and designate him as the redeveloper of the Liberty Harbor North Redevelopment Zone [2] (ii) grant exclusive rights

---

1. In a fully briefed motion to determine the standing of Peter Mocco to prosecute the tax appeal brought by the City and heard at trial on July 2, 1996, this court ruled that Peter Mocco could indeed prosecute the tax appeals. This court held that based upon the above contracts and Mr. Mocco's undertaking of the obligation to pay taxes, Mr. Mocco had standing under N.J.S.A. 54:3–21. In so ruling, this court found that Peter Mocco possessed a sufficient ownership interest in the assessed property so that he could be characterized as a taxpayer. *See Village Supermarkets, Inc. v. West Orange Tp.,* 106 N.J. 628, 525 A.2d 323 (1987)(interpreting the language of N.J.S.A. 54:3–21: "a taxpayer feeling aggrieved by the assessed valuation of his property."); *Ewing Tp. v. Mercer Paper Tube Corp.,* 8

N.J.Tax 84 (1985)(N.J.S.A. 54:3–21 intended to include all those given the right to appeal tax assessments). *Tr. 6/2/96 at p. 20.*

2. The February 14, 1985 contract between JCRA and Mocco was amended on February 27, 1987 to, *inter alia*, assign Mr. Mocco's rights under the contract as the designated redeveloper of the project to an entity to be known as Liberty Harbor North, Inc. (*See Amendment to Contract, dated 2/27/87 pp. 3–4),* a New Jersey corporation of which Mr. Mocco was to be the sole incorporator, shareholder, director and officer. Mr. Mocco guaranteed the performance of Liberty Harbor North, Inc. under the contract. *(See Resolution adopted by the Board of Commission-*

to Peter Mocco to acquire all lots comprising the Liberty Harbor North Redevelopment Zone adjacent to the Subject Property to provide access to the adjoining streets, and (iii) to use its powers of eminent domain to acquire and then resell those abutting parcels to Peter Mocco if he was unable to acquire those parcels on his own. *Tr. 9/11/96 at 61.* Mocco's obligation under the Redevelopment Agreement was to engage in redevelopment activities on the Subject Property itself. *Id.*

Shortly after entering into the Redevelopment Agreement, Peter Mocco entered into an agreement to purchase the Subject Property with the ERS, which provided that the property was sold "as is," but gave Mocco extensive rights to conduct inspections of the Subject Property (which included the right to conduct environmental testing)(the "Purchase Agreement"). Under the Purchase Agreement, the Subject Property was conveyed to Peter Mocco for a price of $20,000 per acre by deeds dated June 24, 26, 27, 1985 from the ERS.

(c) *Impediments to the Redevelopment of the Subject Property*

(1) *The City's Denial of Site Approval and Subdivision of the Subject Property*

After Peter Mocco entered into the Redevelopment Agreement with the JCRA and acquired the Subject Property under the Purchase Agreement with the ERS, the proposed redevelopment of the Liberty Harbor North Zone began experiencing some difficulties. An action was commenced in 1985 by Lawrence and Dolores Eccleston, Jersey City Public Employees, Local 245 and individual members of the ERS against Peter Mocco, the City of Jersey and the ERS. That litigation was settled on May 13, 1986. As part of the settlement, it was acknowledged that the blighting[3] of two essential parcels (blocks 233 and 268), which will be discussed in detail below, would be delayed. However, the City agreed to use all efforts

and resources to obtain "control" over those blocks.

Thereafter pursuant to the Redevelopment Agreement and the Settlement Agreement, the City began to acquire property in the Liberty Harbor North Redevelopment Zone; it did so by using its powers under New Jersey law to declare areas surrounding the Subject Property as blighted areas. *Blau Appraisal at 33.* Indications of difficulties with the proposed redevelopment began to surface when, on June 21, 1988, the Jersey City Planning Board (the "Planning Board") denied applications for approval of both Peter Mocco's site plan and subdivision plan for the redevelopment project. *Blau Appraisal at 33; Tr. 8/28/97 at 128.* The Planning Board articulated that its decision was based upon its belief that two parcels (blocks 233 & 268 on the tax maps of Jersey City) abutting the Subject Property had been improperly blighted by the JCRA. *Id.*

The Planning Board's determination was followed by a resolution of the Jersey City Municipal Council (the "Municipal Council") on November 10, 1988 directing that title to all of the residential properties so condemned be revested in those parties from whom those properties had been wrongfully acquired by the JCRA. *Debtor's Proposed Findings of Fact and Conclusions of Law (the "Mocco Brief") at 5.* In 1990, the Municipal Council's decision was appealed to New Jersey Superior Court where Judge Burrell Ives Humphreys affirmed the Municipal Council's determination. *Id. at 6. See also Tr. 8/28/97 at p. 128.* Judge Humphreys made a judicial determination that the declaration of blight was defective, and that all of the properties which had been condemned by the JCRA in the prior two years, had been illegally condemned. *Id.* The JCRA was required to return the properties to their former owners. JCRA did return the property to the original owners, but only when such property owner requested the return. JCRA never informed the former owners of

---

*ers of the Jersey City Redevelopment Agency at the regular meeting of 6/19/86.)*

**3.** By the use of the term "blighting" this court refers to a declaration that the area is a blighted

area pursuant to N.J.S.A. 1:1–26 and the subsequent condemnation of the property in accordance with N.J. Const. Art. 8, § 3, p. 1.

the illegal blight. *Tr. 8/28/97 at pp. 128–30.* The City has not provided this court with any evidence that it has taken any action to correct the defective condemnation or reinitiate it since the ruling by Judge Humphreys. Nor has the City provided any evidence that if it were successful in condemning the two blocks, that it would sell that property to Mr. Mocco. At the hearing held on August 28, 1997 (the "August 28th Hearing"), this Court presented the City with an opportunity to submit affidavits and certifications to the effect that it was the JCRA's intent to convey the areas which were improperly blighted areas to Peter Mocco at market price. The City, however, never responded to this opportunity. *Tr. 8/28/98 at 126, 176.*

### (2) *Ingress to and Egress from the Subject Property.*

Perhaps the foremost impediment to potential development on the Subject Property is the lack of ingress to, or egress from, the site. Currently, the Subject Property is effectively land-locked.

The Planning Board's denial of the proposed site plan and subdivision, and the Municipal Council's determination of illegal blight as affirmed by the New Jersey Superior Court meant that the condemned property would likely be reclaimed by its original owners. This potentially foreclosed an important means of ingress to, and egress from, the Subject Property via a proposed street, "Liberty Harbor Drive," that was to pass through the improperly blighted parcels and which would have connected Liberty Harbor Drive with Grand Street. *Tr. 8/28/97 at 128.* In 1987, prior to this determination of illegal blighting, work had been started on the construction of Liberty Harbor Drive. The City spent approximately $300,000 in construction costs; however, the portion of the street that was paved and partially completed has been fenced off for at least five years without any further action being taken, and continues to exist in this partially-completed state. *Tr. 8/29/98 at 44.* As admitted by the City's expert, the illegal blight lies directly under Liberty Harbor Drive *(Tr. 8/29/97 at 44).* Thus, until the blight is corrected, completion of the road is impossible.

A further impediment to potential access to the Subject Property stems from the fact that key portions of two arteries located near the Subject Property, Jersey Avenue and Luis Muñoz Marin Boulevard ("Marin Boulevard"), that were to provide ancillary ingress to, and egress from the Subject Property, have not, as yet, been dedicated as public roads by the City. *Tr. 8/29/97 at 45.* Nothing obligates the City to dedicate the roads for public use, and, moreover, because the portions of both Jersey Avenue and Marin Boulevard which would serve as supplemental access to the Subject Property have not been dedicated by the City for use as public roads, there is nothing to prevent the City from selling such land for private development or any other lawful purpose.

Even if the non-dedicated portions of both Jersey Avenue and Marin Boulevard were dedicated for use as public roadways, it is doubtful that, at present, either road could serve as meaningful access to the Subject Property. The portion of Jersey Avenue to the north and west of the Subject Property is a dedicated road, but the Subject Property does not directly abut that portion. Instead, the Subject Property is separated from the non-dedicated portion of Jersey Avenue (which is unpaved, unimproved and in poor condition) by a parcel currently owned by Consolidated Rail Corporation ("Conrail"), which parcel currently does not provide any means of ingress or egress to or from the Subject Property, via easement or otherwise.[4] *Tr. 9/11/96 at 51.*

---

**4.** On March 14, 1984, Peter Mocco and Conrail entered into a non-binding memorandum of understanding, whereby Conrail, subject to approval by its board of directors, was to convey the parcel (block 60, lot 20A on the tax maps of Jersey City) abutting Jersey Ave. to the west, and the Subject Property to the east to Peter Mocco for $102,300.00. *Memorandum of Understanding dated March 14, 1984, p. 1 (the "Conrail–Mocco* *MOU").* The Conrail–Mocco MOU further provided that if Mocco failed to (i) furnish survey data and a title report, (ii) approve a draft deed within 15 days after receipt, or (iii) failed to pay the balance of the purchase price and accept delivery of title documents within 10 days, then the memorandum of understanding would be null and void. *Id. at 4.* There were no proofs submitted by either party that the Conrail Board

Similarly, Marin Boulevard does not directly abut the areas of the Subject Property where the proposed residential development was to take place, but is separated therefrom by a small parcel (block 60, lot 28E on the Jersey City tax maps) currently owned by Maritime Power, Inc. ("Maritime Power"). As with the Conrail–Mocco MOU (*see n. 4 below*), a potential contract has expired between Van Vorst Street Associates and Maritime Power dated May 27, 1987, whereby Van Vorst Street Associates was to acquire the parcel abutting Marin Boulevard. (*See* Testimony of Joseph Hiller, the City's expert, *Tr. 8/28/97 p. 147*). The City asserts, without any proof, that Mr. Mocco is affiliated with Van Vorst Street Associates. The Maritime Power contract is over eleven years old, and no evidence has been provided as to whether the contract contained any contingencies, or whether it is capable of being enforced. Furthermore, the Maritime Power parcel abuts the portion of the Subject Property owned by Liberty Harbor Marina and (issues of dedication of Marin Boulevard aside) would only provide access to the proposed residential portion of the Subject Property in a rather circuitous fashion. In addition, the two lanes of Marin Boulevard would likely be unable to accommodate the daily traffic burdens imposed by the residential portions of the Subject Property. *Id. at 46.* Lastly, at the August 29th Hearing, the City's expert conceded that four lanes—and not the two lanes provided by either Marin Boulevard or Jersey Avenue—were needed for effective ingress and egress to and from the Subject Property, and that the property would be less desirable to a reasonably prudent buyer if there were not more than one means of road access to and from the Subject Property.[5] *Tr. 8/29/98 at 41.*

Any potential access to the Subject Property via Marin Boulevard or Jersey Avenue is further complicated by the conditions present along those roads. The expert real estate appraiser for the City, Joseph Hiller ("Hiller"), conceded at the August 29th Hearing that along Marin Boulevard are aban-

doned industrial buildings and other dilapidated structures, and that, until recently, the street was lined with signs warning of PCB's and other toxic substances hazardous to human life. Indeed, Hiller conceded that given the traffic burdens and conditions along Marin Boulevard, it would not be a reasonable point of access to the Subject Property. *Id. at 50.* As with Marin Boulevard, conditions along Jersey Avenue do not provide reasonable access to the Subject Property. The portion of Jersey Avenue that would potentially provide access to the Subject Property is the western side of the non-dedicated part of Jersey Avenue that abuts a parcel (block 60, lot 19R on the Jersey City tax maps) used for illegal dumping, known to the Environmental Protection Agency as "Turnpike Dump Five," and which was the site of a large, toxic fire in 1991 (the so-called "Aetna Street Fire"). *Blau Appraisal at 20.* In addition, the property is directly adjacent to an operation known as the Schiavone Scrap Metal Yard. The scrap yard is littered with industrial scrap and contains a recycling facility. *Id.* at 21. Garbage barges dock at the yard and deliver refuse; it is contaminated with PCB's and monitoring wells have been installed which pump contaminated liquid from the ground. *Id.* Other contaminated properties which abut the Jersey Avenue side of the property are the Jersey Auto Wreckers site, and the Summit Metals Company, Inc. *Id.* at 22.

(3) *Requirements of the Liberty Harbor North Redevelopment Plan, as Amended*

Further impediments to the Debtor's redevelopment of the Subject Property, stem from the terms of the 1983 Amendments to the Redevelopment Plan. Foremost among these impediments is the requirement that the City grant approvals to the Debtor's site plan and subdivision plan. The Amended Redevelopment Plan states:

[p]rior to commencement of construction [upon the Subject Property], architectural

approved the transaction contemplated by the ConrailMocco MOU, or that any of the conditions required thereby were fulfilled.

5. In his appraisal, however, Mr. Hiller makes no adjustment for the fact that access to the Subject Property is merely potential rather than actual.

drawings, specifications, and site plans for the construction and/or rehabilitation of improvements to the [Subject Property] shall be submitted by the [Debtor] for review and approval by the [Planning Board], and by the [JCRA] for review and approval so that compliance of such drawings, specifications and plans to the Redevelopment Objectives can be determined. *Amended Redevelopment Plan, Section X(A).* As noted above, the City has failed to grant these necessary approvals to the Debtor's proposed plans to redevelop the Subject Property.

Secondly, section XIII(8) of the Amended Redevelopment Plan requires that "all development within the Residential Townhouse District [of the Subject Property] must front upon Grand Street." As discussed *supra,* the declaration of illegal blighting (and consequent possible reclamation by the former owners) of the parcels between Grand Street to the north and the Subject Property to the south have, in all likelihood, foreclosed the possibility that the Subject Property could front upon Grand Street as required by the Amended Redevelopment Plan. *Amended Redevelopment Plan, Section XIII(8).*

Lastly, the Amended Redevelopment Plan's traffic "circulation map," which sets forth the traffic patterns to and from the Subject Property, requires that there be a certain number of access points into and out of the Subject Property, via Grand Street. The New Jersey Superior Court's affirmation of the City's declaration of illegal blighting in the parcels surrounding the Subject Property has made the circulation map's required traffic flow patterns to and from the site an impossibility. *Id. (Circulation Map).*

### (4) *Environmental Contamination on the Subject Property*

Both parties have made assertions relating to the environmental contamination at the site. Although the City contends that the amount of remediation has not been quantified by NJDEP, none of the parties dispute that the property is contaminated. As early as 1984 it was clear that all parties, including the JCRA and Peter Mocco were aware of environmental contamination on the site. Al-

though debtor's expert, Mr. Blau, testified that the $20,000 per acre price was for land which Mr. Mocco thought was clean property in 1984, this court finds that the evidence proves the contrary. *Tr. 8/28/97 at p. 91.* As brought out by Debtor's own counsel on cross-examination of Mr. Hiller concerning the City's failure to deduct for environmental contamination, anyone viewing the Liberty Harbor North property would have been aware immediately of the environmental contamination. *Tr. 8/29/97 at p. 66.* Counsel, James Scarpone, Esq., stated, "[a]nd the condition in which this property existed in 1984, any buyer looking at it would know that there was a problem would he not?" *Id.* Mr. Scarpone continued, "[d]idn't he tell you what the history of the property was . . . in 1984 . . . Didn't he tell you about the illegal dumping historically that had occurred there?" Apparently, mounds of garbage littered the property, requiring extensive carting. *Id.* Mr. Scarpone, also elucidated, as did the Blau appraisal, on the notoriously contaminated properties surrounding the subject site, *id.* at 67, which are discussed *infra.* During testimony, the City's expert agreed that the statements were true and that contamination was indeed visible during the critical periods.

In addition, it was clear that the parties knew that there were concerns about the soil quality. A report was issued by Paulus Sokolowski and Sartos Engineers on June 12, 1984 indicating that site had been filled and consisted of soft-organic soils which were unsatisfactory bearing materials that could not support conventional spread footing foundations. *Blau App. at 33.* In addition, debtor's expert testified at trial, that this report was a part of the McGuire Appraisal supporting the original purchase price. *Tr. 8/28/97 at 21.*

Finally, the contracts executed by the parties evidence an acute awareness of the environmental problems with the land. The Redevelopment Agreement dated February 14, 1985 between Mocco and the JCRA contract contained an extensive environmental indemnity provision. The provision, which is separately enumerated as paragraph 8.12, is three-quarters of a page long. That provi-

sion provides that Mocco could conduct necessary testing to determine soil conditions and presence of hazardous or toxic substances. *Redevelopment Agreement, p. 26–27.* If Mocco was satisfied with the results then Mocco would indemnify JCRA at the closing for all liability arising from any claims concerning the hazardous or toxic substances associated with the land. *Id. at 26.*[6] The agreement specifically references liability arising from penalties or remedial action imposed by the New Jersey State or Federal environmental agencies. *Id. at 27.* The provision further references various environmental protection laws. *Id.* (citing The New Jersey Environmental Clean–Up Responsibility Act, N.J.S.A. 13:1K–6 *et seq.;* The New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10–23.11 *et seq.;* and The New Jersey Water Pollution Control Act, N.J.S.A. 58:10A–1 *et seq.;* N.J.S.A. 23:5–28.). In addition, the Purchase Agreement with ERS contained environmental indemnity provisions and also permitted Mocco to conduct extensive testing on the land. Likewise, the Stipulation of Settlement, referred to above in the litigation commenced by individual members of ERS *et al.* against Mocco and JCRA, *et al.,* contained an environmental indemnity provision which specifically refers to "EPA indemnification." (U.S. Environmental Protection Agency). *Stipulation of Settlement filed May 13, 1986, p. 5.*[7] All of the above documents containing the environmental indemnity provisions were signed by Peter Mocco.

Further indication that the parties were bargaining for the sale of contaminated property is that the price per acre of other parcels in the Liberty Harbor North Redevelopment Zone was more expensive than the $20,000 per acre paid by Peter Mocco for the subject site, even though the other parcels were also contaminated. Thus it can be inferred that Mr. Mocco received a discount for

the purchase of dirty land and in compensation for his assumption of environmental liability. This court is also impressed by the fact that an appraisal by Mr. Blau prepared in 1995 deducted nothing for contamination, yet in his 1997 appraisal he sought a 75% deduction in the valuation of the same property. Blau attempted to explain this at trial by asserting that in preparing his 1995 appraisal he had available only two reports from the Langan Engineering firm detailing the environmental contamination on the site. In the 1997 report, however, he had a third report from Langan Engineering. *Tr. 8/28/97 at 84.* After being questioned as to the difference between the contamination described in the two reports, Mr. Blau indicated that the only discrepancy between the reports was that the 1995 report did not contain cadmium, carcinogenic polynuclear compounds and PCB's in the long list of pollutants. *Id.* Mr. Blau did not explain how those additional three chemicals caused the magnitude of contamination to change from a zero percent deduction for contamination to a seventy-five percent deduction.

Finally, this court is not persuaded by debtor's argument that real estate developers were not concerned with environmental issues back in 1984–85. Debtor urges this court to find that environmental indemnity provisions were routinely entered into, without reduction in price or concern about remediation. This proposition is contradicted by the facts indicated above, as well as by testimony of the debtor's expert during cross-examination that a large-scale development in the Jersey City area had an environmental remedial plan in place in 1987 (Hovnanian/Droyers Point/Society Hill project). *Tr. 8/28/97 at 22.* The City's counsel also questioned the expert, Mr. Blau, as to whether he was familiar with remediation plans in other Jersey City developments during the 1985–1987 time-frame, (i.e. Newport pro-

---

**6.** Charles Blau, debtor's expert, testified that environmental problems were not a concern in 1985. He pointed to the fact that the Redevelopment Agreement did not give Mocco the option of "getting out" of the contract if he found the property to be contaminated. *Tr. 8/28/97 at 18–19.* However, without making any findings on the matter, it appears to this court that Mocco did have the right to terminate the indemnity requirement if he found the property to be too contaminated.

**7.** The provisions of that stipulation of settlement were incorporated into the Redevelopment Agreement via amendment approved April 30, 1986 by a resolution adopted by the Board of Commissioners of the JCRA.

ject—1985 remedial plan for environmental clean-up; Hudson Exchange project—1987 remedial plan). Mr. Blau was unfamiliar with those plans. *Tr. 8/28/97 at 21–25.*

### (5) *Economic Feasibility of Redevelopment of the Subject Property*

The City contends that Jersey City was flourishing and that there was rampant large scale residential development of properties in Jersey City during the critical assessment periods, thus making the redevelopment of the subject property economically feasible. On cross-examination, however, the City's expert, Mr. Hiller conceded that all nearby developments were in bankruptcy during the 1988–1995 time-frame. (Portside Tower (closest development to subject site along with Port Liberte) experienced financial difficulty in 1987, *Tr. 8/29/97 at p. 6–7,* was in bankruptcy between years 1988–1992, *id. at 9,* and was ultimately lost in foreclosure. *Id. at 7.* Port Liberte (located right on the other side of Liberty State Park from the subject site) was in bankruptcy from 1988–1992, was lost to the lender and was ultimately sold at a small fraction of mortgage lien. *Id. at 9.* Newport project had financial problems and failure with units remaining vacant from 1988—1995. *Id. at 14.*)

## VALUATION OF THE PROPERTY

The parties agree that the appropriate valuation methodology for the vacant land comprising the property is the sales comparison approach. They also agreed that rather than undertaking individual appraisals for each of the eleven tax years, the appraisal should analyze sales data spanning the entire time frame from 1985 through 1994. Consistent with current appraisal theory, the appraisals brought back the sales data to reflect assumed pricing levels as of the first date of valuation. Inherent in such application is the requirement of making adjustments for time. The parties did not differ dramatically in their adjustments for time.[8]

As is discussed, *infra,* at length, the parties disagreed markedly in the appropriate "highest and best use"[9] of the property. The debtor's appraisal suggested a highest and best use of development for the years 1986–1988 and thereafter, to hold for future development and to operate the marina to generate a cash flow to offset costs. Accordingly, the debtor's appraisal also included a cost approach valuation for the marina enterprise and its associated buildings. On the other hand, the City's appraisal is premised entirely upon a highest and best use of assemblage of a 75 acre tract and large-scale multi-family residential development consisting of at least 1,880 condominium units pursuant to the Liberty Harbor North Redevelopment Plan. Thus, the City's appraisal suggested demolishing the marina, and valued the land using the sales approach. As part of the valuation, the City derived a "per unit" cost from comparables which represented sales of large scale multi-

8. Debtor's appraisal, which supported its adjustments for time with a bar graph showing average prices of real estate sales in Jersey City from 1983–84 through 1993–94, did not specifically enumerate the percentage of increase or decrease for each tax year. *See Blau App. at 19, 39.* However, after making such calculations, the court determined that debtor's figures increased from 1985–86, peaked in 1988 and then steadily decreased from 1988–89 through 1993–94. *Id.* The City's appraisal similarly increased and decreased during the exact time periods as those of the debtor. *See Hiller App.* at 54. The difference between the two appraisals was in the percentage of increase or decrease for each tax year. After comparison of the two appraisals the court has determined that the debtor's adjustments for time increased at a greater percentage during the rising years and then decreased at a higher rate during the periods of decline. Thus the two appraisals display the same trends in market conditions during the same years and ultimately end up in the same place. Accordingly, this court finds the differences to be of little significance for the purposes of this determination.

9. "Highest and best use" is a term of art in the lexicon of real estate appraisal which means the most reasonable and probable use of vacant land or improved property that supports the highest present value as of the date of the appraisal. As is discussed, *infra,* there are four criteria that must be met in order to appraise the property at its "highest and best use": (1) legal permissibility of the proposed use (zoning requirements and legally permitted uses); (2) physical possibility for the proposed use; (3) financial feasibility of the project, and (4) whether the proposed use of the property will result in maximization of the profits derived therefrom. (*Real Estate Appraisal Terminology,* Society of Real Estate Appraisers, pp. 126–27 (Rev. Ed.1984)).

family residential developments, with approvals in place and access to major roadways.

### 2. The Hiller Appraisal of the Property

As stated above, the City's expert derived a "per unit" valuation for the property based upon eight sales comparables. The value as of October 1, 1985 was $4,750 per unit. *Hiller App. at 57.* After adjusting for time and multiplying by the number of units which would be constructed on the land during the relevant time period,[10] *id.;* Mr. Hiller concluded that the valuation of the Property was as follows:

| Market Valuation Date | Tax Year | Appraisal Value of Property |
|---|---|---|
| October 1, 1985 | 1986 | $5,860,000 |
| October 1, 1986 | 1987 | $6,450,000 |
| October 1, 1987 | 1988 | $7,740,000 |
| October 1, 1988 | 1989 | $9,280,000 |
| October 1, 1989 | 1990 | $9,280,000 |
| October 1, 1990 | 1991 | $8,820,000 |
| October 1, 1991 | 1992 | $9,250,000 |
| October 1, 1992 | 1993 | $11,010,000 |
| October 1, 1993 | 1994 | $11,520,000 |
| October 1, 1994 | 1995 | $10,950,000 |

(Hiller App. at 1).

As is discussed in great detail below, this court rejects the appraisal of Mr. Hiller as it is entirely premised upon an assemblage of a 75 acre tract, and full scale development of the property in accordance with the Liberty Harbor North Redevelopment Plan. Inherent in such assumption, is that the parcels which have been illegally blighted are successfully acquired by the redeveloper and that the property has access to major roadways, frontage on Grand Street, subdivision approvals are granted by the City of Jersey City and the contamination is remediated. As this court finds that none of those assumptions are realistic or in prospect, it rejects highest and best use proposed by the City as well as the valuation based upon that use. Unfortunately, the City offered no alternative valuation model; thus the appraisal must be rejected in its entirety.

10. 1,234 units in 1985–90; 1,362 units in 1991; 1,707 units in 1992; 1,880 units in 1993–94. *Hiller App.* at 57.

### 1. The Blau Appraisal of the Property

The debtor's appraisal was divided into two sections, a valuation of the vacant land using the sales comparison approach, and an appraisal of the marina and associated buildings using the cost approach. Consistent with appraisal of vacant land, Mr. Blau employed a "per acre" valuation methodology and arrived at a price per acre of $20,000 after reviewing sales of land in the Liberty Harbor North Redevelopment Zone, and relying most heavily on the sales of the subject site. *Blau App. at 39–40.*

After adjusting for time Mr. Blau multiplied the number of acres [11] by the price per acre and determined a price for the vacant land of:

| Market Valuation Date | Tax Year | Appraisal of Vacant Land |
|---|---|---|
| October 1, 1985 | 1986 | $611,600 |
| October 1, 1986 | 1987 | $886,600 |
| October 1, 1987 | 1988 | $1,204,850 |
| October 1, 1988 | 1989 | $1,388,300 |
| October 1, 1989 | 1990 | $1,238,500 |
| October 1, 1990 | 1991 | $1,007,000 |
| October 1, 1991 | 1992 | $1,129,700 |
| October 1, 1992 | 1993 | $1,100,250 |
| October 1, 1993 | 1994 | $968,200 |
| October 1, 1994 | 1995 | $880,200 |

The next component of Mr. Blau's appraisal was to determine the value of the marina and associated buildings using the cost approach. (the methodology of the cost approach is discussed, *infra*). As is discussed in detail below, Mr. Blau used both the actual costs of construction of the boat slips as supplied by Peter Mocco as well as the Marshall Valuation Service to determine the costs of materials. Mr. Blau chose the low end range of Marshall's costs and employed a local multiplier of 1.24. After giving equal weight to both actual costs and Marshall's costs, the price per slip was determined to be $3,900. *Blau App. at 41.* The appraisal selected an entrepreneurial profit of 15% and depreciation of 10 years. *Id.* After multiplying the price per slip by the number of slips for the respective years (96 slips in 1992 an 110 slips in 1993–95), Mr. Blau arrived at a valuation as follows:

| Market Valuation Date | Tax Year | Appraisal of Marina Slips |
|---|---|---|

11. The number of acres was 30.58 acres for tax years 1985–89; 31.08 acres for tax year 1990; 39.64 acres for tax year 1991; 44.01 acres for tax years 1992–95.

| October 1, 1991 | 1992 | $240,600 |
|---|---|---|
| October 1, 1992 | 1993 | $210,000 |
| October 1, 1993 | 1994 | $231,000 |
| October 1, 1994 | 1995 | $196,700 |

*Blau App.* at 42.

Next, the appraisal valued the buildings associated with the marinas, this time, employing only the Marshall's valuation service to arrive at a price per square foot for the outbuildings of $27.08 and $60.28 per square foot for the restaurant. *Id.* After applying the appropriate depreciation and multiplying by the number of square feet for the build-

ings the appraisal arrived at the following valuation:

| Building | Sq. Ft. | Appraisal Value of Buildings |
|---|---|---|
| Master Marine Laundry | 4,000 | $38,620 |
| Liberty Seafood Rest. | 3,600 | $154,728 |
| Sen Kai Fish Sales | 1,200 | $11,5920 |
| New York World Ocean | 800 | $7,728 |

The appraisal concluded the valuation of the entire property by adding the values of the costs and improvements and then applying a 75% deduction from the total value for a valuation as follows:

| Market Valuation Date | Tax Year | Total Valuation Clean | Total Valuation Dirty after 75% deduction |
|---|---|---|---|
| October 1, 1985 | 1986 | $611,600 | $0.00[12] |
| October 1, 1986 | 1987 | $886,600 | $0.00 |
| October 1, 1987 | 1988 | $1,204,850 | $0.00 |
| October 1, 1988 | 1989 | $1,388,300 | $0.00 |
| October 1, 1989 | 1990 | $1,238,500 | $310,000 |
| October 1, 1990 | 1991 | $1,007,000 | $251,750 |
| October 1, 1991 | 1992 | $1,370,300 | $342,600 |
| October 1, 1992 | 1993 | $1,523,000 | $380,750 |
| October 1, 1993 | 1994 | $1,411,900 | $352,975 |
| October 1, 1994 | 1995 | $1,289,600 | $322,400 |

*Blau App.* at 64.

## DISCUSSION

The parties do not dispute that the bankruptcy court has the authority to determine tax assessments of municipalities. Rather the parties dispute the underlying methodology for the tax assessment and the highest and best use of the property. The City of Jersey City argues that the property should be valued at its highest and best use, which is a large scale multi-family residential development on a 75 acre tract. Subsumed within that argument, the City asserts that the court must take into consideration all reasonably possible (if not actual) means of access to the premises in determining such highest and best use, as well as a "per unit" approach to valuing the land. The City also disputes the debtor's methodology for valuing the marina located on the premises. The City asserts that the cost approach to valuation is wholly inappropriate and only to be used as a last resort. Finally, the City objects to any deduction in value for environmental clean-up

costs associated with the contamination of the site.

The debtor counters that the highest and best use of the land is for development in the earlier assessment years, but for future development starting in tax year 1988. Debtor contends that full scale residential development is remote and speculative due to the landlocked nature of the premises, the illegal blighting of key pieces of land by the City, the lack of vehicular access, the denial of subdivision approval by the City planning board, as well as the environmental contamination. Thus the debtor advances a "per acre" approach to valuation. The debtor urges the court to apply a cost approach to valuing the marina, asserting that it is the most appropriate method given the unique features of a marina enterprise. Finally, the debtor argues that a 75% deduction in value for environmental contamination is proper because environmental issues were not of concern when the property was first purchased. Accordingly, the debtor asserts, the comparable properties purchased during that

12. Appraiser concluded that after borrowing funds to clean up the contamination, paying interest, principal, capitalized, the expense would

exceed the value. Therefore a zero valuation is indicated because the property would not sell. *Blau App. at 64.*

period do not reflect appropriate environmental reductions.

## I. Bankruptcy Court Authority to Review Tax Assessments

■ The bankruptcy court has authority to adjudicate tax assessments of real property pursuant to 11 U.S.C. § 505(a). 11 U.S.C. § 505(a) provides:

(a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

(2) The court may not so determine—

(A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title; or

(B) any right of the estate to a tax refund, before the earlier of—

(i) 120 days after the trustee properly requests such refund from the governmental unit from which such refund is claimed; or

(ii) a determination by such governmental unit of such request.

Section 505 has been interpreted to permit the bankruptcy court to determine the amount of any tax,[13] including real estate tax assessments. *See In re Custom Distribution Services, Inc.*, 216 B.R. 136, 148 (Bankr. D.N.J.1997); *In re A.W.B. Assocs., G.P.*, 144 B.R. 270 (Bankr.E.D.Pa.1992)(court applied section 505 for the purpose of challenging several years of prepetition real estate tax assessments); *In re Morelyn Plaza, Ltd., Partnership*, 1997 WL 68578 (Bankr.E.D.Pa. January 23, 1997)(same); *In re Piper Aircraft Corp.*, 171 B.R. 415 (Bankr.S.D.Fla. 1994)(same). The ability of a bankruptcy court to determine any and all issues of tax liability of debtors, when there has been no prior determination by any state, judicial or judicial body, is well established in the Third Circuit. *In re Custom Distribution*, 216 B.R. at 148; *In re A.W.B. Assocs.*, 144 B.R. at 278 (citing *In re Century Vault Co.*, 416 F.2d 1035 (3d Cir.1969); and *In re Monongahela Rye Liquors*, 141 F.2d 864, 866–68 (3d Cir.1944)). In determining such tax liabilities, section 505 grants a bankruptcy court broad discretionary powers. *In re Penking Trust*, 196 B.R. 389 (Bankr.E.D.Tenn.1996).

■ A debtor's failure to meet state procedural requirements (such as payment of tax obligation) or the lapse of time between a tax year and the time of the filing does not limit the applicability of 11 U.S.C. § 505. *In re Custom Distribution*, 216 B.R. at 148 (citing *In re A.W.B. Assocs.*, 144 B.R. at 278; *Morelyn Plaza Ltd. Partnership*, 1997 WL 68578 at *3 (same)). In permitting assessments of real estate taxes where state law procedural requirements are not met, the bankruptcy code through section 505, seeks to protect creditors from dissipation of an estate's assets. *In re Piper Aircraft Corp.*, 171 B.R. at 418. Such dissipation could result if creditors are bound by a tax judgment which a debtor, due to its ailing conditions, failed to contest. *Id.*

■ Once beyond the state's *procedural* requirements, the bankruptcy court must give full faith and credit to the *substantive* law of the state to answer the ultimate question of whether the taxes are legally due and owing. *In re Custom Distribution*, 216 B.R. at 148 (citing *In re Morelyn Plaza Ltd. Partnership*, 1997 WL 68578 at *3 ("[t]he valuation of property for the purpose of determining property taxes must be consistent with [substantive] state law principles, as the valuation is merely part and parcel of the adjudication of the tax due and owing, a question controlled by state law." *Id.*)).

In the instant case, debtor seeks a review of the City's assessments for tax years 1986

---

13. *See, e.g., H & H Beverage Distributors v. Department of Revenue*, 850 F.2d 165 (3d Cir.), *cert. denied*, 488 U.S. 994, 109 S.Ct. 560, 102 L.Ed.2d 586 (1988); *Matter of Ribs–R–Us, Inc.*, 828 F.2d 199 (3d Cir.1987); *Quattrone Accountants, Inc. v. Internal Revenue Service*, 895 F.2d 921 (3d Cir. 1990), for general authority of bankruptcy court to determine amount or legality of a tax.

through 1996.[14] Since a property is assessed by its value as of October 1 of the pre-tax year period, *N.J.S.A.* 54:4–23, the court must value the Property as of October 1 for each tax year from 1985 through 1995. In so doing, as stated above, the court must apply the substantive law of the state in which the property is located.

## 2. New Jersey Tax Assessment Law

*Presumption of Validity*

▇▇▇ Under New Jersey law, a municipal tax assessment is clothed with a presumption of correctness. *Schimpf v. Little Egg Harbor Tp.,* 14 N.J.Tax 338 (1994); *Rodwood Gardens, Inc. v. City of Summit,* 188 N.J.Super. 34, 455 A.2d 1136 (App.Div.1982). This presumption does not mean that the tax assessment can never be modified by a court. Rather a taxpayer can rebut the presumption by providing evidence that is "sufficiently 'definite, positive and certain in quality and quantity' to prove a valuation different" from the municipality's assessment. *Schimpf,* 14 N.J.Tax at 343. The " 'so-called' presumption ha[s] no artificial probative force once substantial evidence to the contrary has been asserted." *Ford Motor Co. v. Edison Tp.,* 127 N.J. 290, 312, 604 A.2d 580 (1992).

▇▇▇ In this case, debtor submitted extensive evidence showing numerous obstacles a developer would face in achieving the highest and best use of the premises (multi-family residential development) adopted by the City. The evidence submitted by debtor consisted of an appraisal of Blau Appraisal Company, the Langan Engineering report showing environmental contamination, the Liberty Harbor North Redevelopment Plan and circulation maps, copies of resolutions of the Jersey City planning board denying sub-division application for the subject site, as well as detailed maps and deeds showing the illegal blighting and subsequent land-locking of the premises. This evidence supports debtor's proposed highest and best use as future development and undermines the City's suggested use. Therefore, this court holds that the debtor provided sufficient credible evidence of a variance in value of the Property

between the value of the Property as assessed by the City, and the "true value" of the Property.

▇▇▇ As such, debtor has met its burden of overcoming the presumption of validity of the municipality's assessment, and the court may proceed to a consideration of the proper valuation of the property. *Schimpf,* 14 N.J.Tax at 343. Under the laws of New Jersey, once the presumption of validity of the municipal tax appeal has been overcome by the taxpayer, "the focus then shift[s] to a consideration of the case on the merits and a proper valuation [i.e., 'true value'] of the property." *Id.*

## I. Methodology of Valuation of the Property

The starting point for valuation of real property in New Jersey is set forth in the New Jersey State Constitution which states that all real property dedicated to municipal purposes must be "assessed according to the same standard of value." N.J. Const. of 1947 art. VIII, sec. 1, para. 1. Guided by the standard of assessment in the New Jersey Constitution, the New Jersey State Legislature has enacted legislation requiring a "true value" standard of value to be applied for the purposes of assessing property for "taxation for local use." *In re Custom Distribution,* 216 B.R. at 150 (citing N.J. Stat. Ann. 54:4–2.25).

▇▇▇ "True value" requires the court to "[d]etermine the full and fair value of each parcel of real property at such price as it would sell for at a fair and bona-fide sale for a private contract on October 1 . . . of the pre-tax year period." N.J.S.A. 54:4–23. More particularly, the mandate is to discern the price which would be obtained at a fair sale between a willing buyer and seller. *City of New Brunswick v. State Div. of Tax Appeals,* 39 N.J. 537, 543, 189 A.2d 702 (1963). A willing buyer is a "hypothetical buyer," not actual or in existence. *CPC Int'l v. Borough of Englewood Cliffs,* 193 N.J.Super. 261, 268, 473 A.2d 548 (App.Div.1984).

---

**14.** The parties agree as to the tax years subject to review by this court.

■ Though the methodology for arriving at "true value" is not defined by the legislature, New Jersey courts have consistently approached the determination of true value using one of the three traditionally accepted methods of real estate valuation, namely the sales approach, income approach or cost approach. *Inmar Assocs., Inc. v. Borough of Carlstadt,* 112 N.J. 593, 606–07, 549 A.2d 38 (1988). The decision as to which valuation approach, or approaches, should predominate depends upon the "particular facts and the reaction to them of experts steeped in the history and hopes of the area." *Samuel Hird & Sons, Inc. v. City of Garfield,* 87 N.J.Super. 65, 72, 208 A.2d 153 (App.Div.1965). In addition, a Tax Court [15] in New Jersey is given broad discretion in the choice of valuation methods. *Inmar,* 112 N.J. at 609, 549 A.2d 38 (affirming the "unique capability and responsibility of the Tax Court to exercise its power, in circumstances where the presumption of validity of the local assessment does not apply, to use the information available to it to make an independent determination of value." *Id.).*

In this case the experts agree that the appropriate valuation methodology for the Premises [16] is the sales comparison approach. The parties differ in their calculations and assumptions pursuant to such approach.

*Sales Comparison Approach*

There are three basic approaches commonly used to value real estate: the cost approach, the sales comparison (or market data) approach, and the income capitalization approach, or any combination of these three. (*The Appraisal of Real Estate,* American Institute of Real Estate Appraisers, 9th ed. (1987)).

The sales comparison approach to valuation is a method of estimating market value by comparing the subject property to similar properties that have been recently sold or listed for sale in the same or competing areas. Upward or downward adjustments to the price of the comparable properties are made to account for the differences between the subject property and the sales comparables. *See In re 865 Centennial Avenue Assocs., Ltd., Partnership,* 200 B.R. 800, 804 (Bankr.D.N.J.1996); *see also* Blau App. at 35; Hiller App. at 42. This technique of appraisal assumes that the probable market value of the real estate is established by similar transactions between informed buyers and sellers in the marketplace.

■ The first step in computing the sales comparison approach is to identify the pertinent value-determining characteristics of the subject property. Boyce, Byrl N. and Kinnard, William N. Jr., *Appraising Real Property,* Lexington, 1987, p. 67, *see also* Hiller App. at 42. In appraisal practice, the concept of "highest and best" use represents the premise upon which such value-determining characteristics are based. Society of Real Estate Appraisers, *Real Estate Appraisal Terminology Revised Edition,* Cambridge, 1984, pp. 126–27, *see also Appraising Real Property,* at p. 280 (highest and best use assists in "identifying comparable properties in a direct sales comparison approach to the value." *Id.).* This court must therefore determine the highest and best use of the premises.

*Highest and Best Use*

In determining "highest and best use" the existing utilization of the land serves as the most economically feasible use unless it is more valuable to select an alternative. In that case, the appraisal must determine if it is more economically profitable to raze the existing improvements and develop the site with an alternative use. Often the existing improvements do not reflect the maximally productive use of the site, however, the cost necessary to demolish same and develop the site with an alternative use is not yet economically feasible. The existing use under this scenario is defined as an "interim use" that will continue until such time that demoli-

---

**15.** In its review of the assessment of real estate tax assessments pursuant to 11 U.S.C. § 505(a), the bankruptcy court is essentially performing the functions of the state tax court.

**16.** As will be discussed *infra,* debtor's expert used the cost approach to value the marina and associated buildings. The City's objections to that methodology will be analyzed separately and discussed below.

tion and re-development is economically feasible. *See* Hiller App. at 39. Thus there are three possibilities for the highest and best use: (1) the existing use; (2) an alternative use (such as redevelopment); or (3) an interim use (i.e. hold for future development).

■■■ Under New Jersey law, "highest and best use" is defined as "the reasonably probable and legal use of an improved property which is physically possible, appropriately supported, financially feasible and that which results in the highest value, i.e. most profitable." *Schimpf,* 14 N.J.Tax at 343–44 (citing American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* at 212, 294 (10th ed.1992)); *see also United Jersey Bank–Peoples Trust of NJ v. Lincoln Park Borough,* 11 N.J.Tax 549 (1991). "Property valuation at highest and best use, then, requires the appraisal of each parcel 'as though it were being put to its most profitable use, given probable, legal physical and financial constraints.'" *Ford Motor Co. v. Edison Tp.,* 127 N.J. 290, 301, 604 A.2d 580 (1992) (citations omitted).

■■■ In evaluating the testimony of the appraisers, the court must keep in mind that "an expert's conclusion rises no higher than the data which provide the foundation." *City of Passaic v. Gera Mills,* 55 N.J.Super. 73, 150 A.2d 67 (App.Div.1959), *cert. denied,* 30 N.J. 153, 152 A.2d 171 (1959). Thus the appraiser is not free to propose any alternative use which he or she believes is best suited to the site. Ultimately, "highest and best use valuation has as a prerequisite a probability of achievement... The projected use cannot be remote, speculative or conjectural." *Schimpf,* 14 N.J.Tax at 348.

The New Jersey Supreme Court has cautioned fact-finders against accepting remote alternative uses for a property which are "inherently vague or tenuous." *State v. Caoili,* 135 N.J. 252, 264, 639 A.2d 275 (1994). The Court was concerned that such a practice "could lead to 'unbridled speculation' regarding the fair market value of such property." *Id.* (citations omitted). The Court explained that:

> The risk of unsound and speculative determinations concerning fair market value is real when that determination is based on evidence of a future change that is inherently vague or tenuous because it suggests no more than the possibility of change. That risk can be reduced substantially if the determination of fair market value is based on more cogent evidence indicating beyond a mere possibility that a change of use is likely and, further, that such a change would be an important factor in the valuation of the property.

*Id.*

■■■ As stated by the New Jersey Supreme Court, "Underlying the settled rule that remote uses are irrelevant (citations omitted) is the more basic principle that property valuation should have some relationship to reality." *Hackensack Water Co. v. Borough of Old Tappan,* 77 N.J. 208, 214, 390 A.2d 122 (1978).

Keeping in mind the above stated overriding principles, the court must apply the four pronged test to determine "highest and best use." The proposed use must be (1) legally permissible, (2) physically possible, (3) economically feasible, and (4) profitable. *Schimpf,* 14 N.J.Tax at 344.

In this case, the most fundamental issue, and yet the most contested issue is the highest and best use for the property. The City contends that the highest and best use for the premises is development of 1,880 residential condominium units on the 44.01 acre property, which is deemed to be part of a 75 acre assemblage suitable for large scale redevelopment in accordance with the Liberty Harbor North Redevelopment Plan. This would include demolishing the marina, which would interfere with maximizing the permitted density of multi-family homes on the property. The debtor contends, on the other hand, that the proper use is for development only for the tax years 1986 through 1988 (October 1, 1985—October 1, 1987). After 1988, however, the debtor contends that development was no longer feasible due to the illegality of the blighting of key portions of the assemblage, and the resulting lack of access to the property, the denial of the subdivision application, and the revelation of the extent of environmental contamination. The debtor suggests an interim use of holding the

property for future development and maximizing the existing improvements to generate a cash-flow. A determination of the appropriate use, is perhaps, the essence of valuing this property. The court will therefore, apply the four pronged test in determining highest and best use.

### 1. *Legally Permissible*

■ Highest and best use requires that a use "be legal or, if it is not permitted, must be within reasonable probability of being permitted." *Six Cherry Hill, Inc. v. Tp. of Cherry Hill,* 7 N.J.Tax 120, 129 (1984), *aff'd,* 8 N.J.Tax 334 (App.Div.1986)(citing Scribner, "Highest and Best Use or Most Probable Use," Real Estate Appraiser, May–June 1978 at 26.). In fact, legal use is described as one of the "*a priori* elements necessary to justify an estimate of highest and best use." *Id.* at 128 (citing Ordway and Harris, supra).

■ A material factor in determining whether a particular use is legal is whether or not the property is zoned for such use. *Id.* The City cites a 1928 case standing for the proposition that a property's permissible use under a zoning ordinance impacts critically upon its value. *Overpeck Land Corp. v. Village of Ridgefield Park,* 104 N.J.L. 402, 140 A. 300 (E & A 1928). The City urges this court to find that if the property is zoned for the use, then the legal possibility prong of the highest and best use test is automatically satisfied. Modern cases recognize, however, in today's more active regulatory climate, that "[t]here are additional factors that have a bearing upon the legal use of property. 'Private restriction[s], . . . building codes, historic district controls, and environmental regulations are considered because they may preclude many possible highest and best uses.' " *Six Cherry Hill, Inc.,* 7 N.J.Tax at 130 (citing The Appraisal of Real Estate, supra at 250–251).

■ As stated by Judge Lasser, "[g]overnmental restrictions, such as the requirement of adequate sewage disposal facilities, necessarily affect the determination of highest and best use, and real property cannot be valued as though the restrictions did not exist." *Town of West Orange v. Goldman's Estate,* 2 N.J.Tax 582, 588 (1981)(citing *State*

*v. Wildlife Preserves, Inc.,* 134 N.J.Super. 287, 340 A.2d 665 (App.Div.1975); *Cappture Realty Corp. v. Board of Adjustment of Borough of Elmwood Park,* 126 N.J.Super. 200, 313 A.2d 624 (Law Div.1973), *aff'd,* 133 N.J.Super. 216, 336 A.2d 30 (App.Div.1975); *Halocarbon Products Corp. v. Borough of South River,* 1 N.J.Tax 294 (1980), *aff'd and remanded,* 181 N.J.Super. 1, 436 A.2d 532 (App.Div.1981)).

In the *West Orange* case, the court denied a proposed highest and best use of residential development because required sewers were not in place thereby violating local governmental restrictions. *West Orange City v. Goldman's Estate,* 2 N.J.Tax at 588. The court found that the expert's "conclusion as to highest and best use ignores the pivotal reality that sewers were not only unavailable on the assessing date but that, on that date, there was no reasonable probability that sewer service would become available at any time in the foreseeable future." *Id.*

■ In this case the parties do not dispute that the property is zoned for redevelopment and construction of multi-family residential condominium units. Indeed, the City sets forth the Liberty Harbor North Redevelopment Plan (the "Plan"), which contemplates such development, as the linchpin upon which its proposed highest and best use rests. However, there are numerous restrictions, codes, controls and regulations contained in the Plan itself, as well as ordinances and other sources, which preclude a finding that redevelopment is legally possible at this time. In addition, this court finds that it is not absolute that the zoning permits the proposed development. A resolution of the City Planning Board dated July 12, 1988 questions the zoning of the property for residential development in light of the improper blighting. Furthermore, the debtor's expert testified, under cross-examination by City's counsel, that the zoning ordinance would require frontage and access which is presently not available. *Tr. 7/2/96 at p. 49–50.* The court will address each of those legal concerns below.

*Subdivision Approval.*

A "highly material factor bearing on the optimum use of the property and its fair market value" is whether the property is or feasibly could be subdivided as proposed. *State v. Caoili,* 135 N.J. at 268, 639 A.2d 275. In this case the property is not subdivided as would be required for 1,880 condominium units.

The New Jersey courts have dealt with that exact issue in the context of condemnation cases. *See e.g. Caoili,* 135 N.J. 252, 639 A.2d 275, *State v. Hope Road Assocs.,* 266 N.J.Super. 633, 630 A.2d 387 (App.Div.1993), *modified on other grounds,* 136 N.J. 27, 641 A.2d 1038 (1994)(experts testified as to use which did not have subdivision approval, but which approval, experts asserted, could easily be obtained); *State v. Inhabitants of Town of Phillipsburg,* 240 N.J.Super. 529, 541–42, 573 A.2d 953 (App.Div.1990)(same). *See also State v. Gorga,* 26 N.J. 113, 138 A.2d 833 (1958)(experts testified as to use which was not in accordance with zoning, but which zoning, experts asserted, could easily be changed). "In such case, where an appraiser, speculates that the development would proceed despite the lack of subdivision approval," the courts held that evidence of the proposed development could not be presented unless it is not a remote or speculative event. *Caoili,* 135 N.J. at 265, 639 A.2d 275 (citing J.D. Perovich, Annotation, Admissibility of Evidence of Proposed or Possible Subdivision or Platting of Condemned Land on Issue of Value in Eminent Domain Proceedings, 26 A.L.R.3d 780 (1969 & Supp.1993)). Thus the court must determine "[w]hether favorable action by the public entity 'was so likely to eventuate and so imminent as to deserve being taken into account.'" *Id.* (quoting *Salem Country Club,* 487 N.E.2d at 865). Since value cannot be established by guess or conjecture; *State v. Faps Realty Corp.,* 197 N.J.Super. 44, 49, 484 A.2d 35 (App.Div.1984); there must be "some showing of the reasonable probability of such eventuality, and that a willing buyer and a willing seller would consider that probability in reaching a selling price." *Caoili,* 135 N.J. at 256, 639 A.2d 275. Whether there is any evidence supporting such a view that subdivision approval is imminent, is, in the first instance, a question for the trial court to resolve. *Gorga,* 26 N.J. at 117, 138 A.2d 833.

In making such determination, the New Jersey Supreme Court has provided some guidance. "Courts will insist on some evidence relating to the feasibility, suitability, and practicability of a proposed potential subdivision and, especially where such a proposed subdivision is complex, whether the owner has undertaken "affirmative efforts" to obtain approval of such a subdivision." *Caoili,* 135 N.J. at 267–68, 639 A.2d 275. The court explained that:

> Subdivisions are frequently tied in with numerous other requirements affecting the potential development of the property that implicate not only the division of property but its configuration; the application of bulk requirements affecting the location and placement of proposed structures; necessary on-site improvements involving infrastructure, services, and the like; access to the property; surrounding roads; and needed off-site improvements. Consequently, The question is whether, from the viewpoint of the willing buyer and willing seller, the applicant will face any legal impediment to approval if it meets the appropriate standards, including providing for safe and convenient vehicular traffic access. *See* N.J.S.A. 40:55D–41(b); *see also State v. F & J Partnership,* 250 N.J.Super. 19, 29, 593 A.2d 352 (App.Div. 1991).

*Id.* at 269, 639 A.2d 275.

"Consideration must also be given to whether ... the site plan may be legally denied based entirely on off-site conditions, such as *vehicular traffic* that may be generated on existing roadways." (emphasis added). *State v. Hope Road Assocs.,* 266 N.J.Super. 633, 648, 630 A.2d 387 (App.Div.1993)(citing *Dunkin' Donuts of N.J., Inc. v. North Brunswick Tp.,* 193 N.J.Super. 513, 515, 475 A.2d 71 (App.Div. 1984); *Lionel's Appliance Ctr., Inc. v. Citta,* 156 N.J.Super. 257, 264, 383 A.2d 773 (Law Div.1978)).

Where the likelihood of subdivision approval is not demonstrated, the land

should be evaluated as unsubdivided, vacant land, for it is error to permit the jury [17] to value the tract as if it were divided into building lots. *State v. Inhabitants of Town of Phillipsburg,* 240 N.J.Super. 529, 542, 573 A.2d 953 (App.Div.1990).

Unlike the above cited cases, where the issue of subdivision had not yet been decided by the municipality, here the City Planning Board has twice denied debtor's applications. Thus the facts mitigate strongly against permitting valuation as though the property had been subdivided.

On two separate occasions Debtor's application for major subdivision was denied. The original application was denied because it was incomplete. However, the second application was denied on June 21, 1988 and memorialized on July 12, 1988, on the merits. The City Planning Board found that the property lacked access to roadways, thereby providing insufficient vehicular access and circulation. The development was supposed to have frontage on Grand Street, as that was the only road with the capacity and size to handle the traffic generated by 1,880 condominium units and their occupants. The property as it is currently configured does not have access to Grand Street due to the unsuccessful blighting of blocks 233 and 268.

The City Planning Board reached its decision after hearings in which testimony was heard from a representative of the Jersey City Redevelopment Agency as well as a registered professional engineer. Over 15 exhibits were marked for identification, including a vehicular traffic circulation impact study which proposed alternative means of access other than Grand Street. Despite the extraordinary effort mounted by the debtor and the JCRA to obtain approval, the Planning Board denied the application as it would not promote the public safety and general welfare.

Although requested to do so by the court on two separate occasions during trial, the City did not produce an iota of evidence that the blighting could be corrected. Nor did the City produce any evidence that it would attempt to correct the problem by properly blighting the crucial piece of land which would alleviate the concerns of the Planning Board.[18] The City also failed to produce any evidence that the Planning Board would approve a future application for subdivision without providing for the requested access to Grand Street. Similarly, the City produced no evidence that the provision in the Redevelopment Plan would be amended to remove the requirement of subdivision approval.

To the contrary, the City's own actions belie its position in this court. In the ten years since denial of subdivision, the City has taken not a single step toward correcting any of the noted defects. It has not corrected the blighting of the property, and has not continued on with construction of Liberty Harbor Drive (where the road does not cross improperly blighted land). In addition, the City's conduct in this and other litigation, indicates to this court that it does not intend to go forward with this project, during the assessment periods, now, or in the near fu-

---

**17.** In condemnation cases, the jury, and not the court, is the fact finder. In assessment cases, the court is the factfinder. The condemnation cases may be applied by analogy, because the factfinder in both instances is attempting to determine highest and best use, and specifically, whether "a willing buyer, without compulsion, would recognize the probability of site plan approval in the near future when determining market value." *Hope Road Assocs.,* 266 N.J.Super. at 643, 630 A.2d 387.

**18.** The debtor asks this court to infer that the members of the planning board would testify in a way adverse to the position of the City, since those parties failed to testify. The court declines to do so. "The rule permitting adverse inferences to be drawn from the failure of a party to produce a witness raises a natural inference that the failing party fears exposure of those facts which would be unfavorable to him or her." *Maul v. Kirkman,* 270 N.J.Super. 596, 610, 637 A.2d 928 (App.Div.1994)(citing *State v. Clawans,* 38 N.J. 162, 171, 183 A.2d 77 (1962)). "The inference arises because it would be natural for a party to produce the witness.... But where a witness is equally available to both parties, the inference generally may not be drawn." *Id.* at 610, 637 A.2d 928. In this case, the planning board or JCRA members could have been deposed or subpoenaed by the debtor; thus the inference is unavailable. However, it is the failure of the City to produce *any evidence* of intention to or progress in correction of defective blighting or approval of subdivision, which persuades this court that such acts are not in prospect.

ture. The City has filed counter-claims and engaged in extensive litigation, requesting, *inter alia*, that the Liberty Harbor North Redevelopment Plan be declared null and void. That conduct is irreconcilable with the City's assertions before this court, that the Redevelopment is sure to go forward pursuant to the Plan. Indeed, the very Plan upon which the City's appraisal rests as authority for the highest and best use, is the same Plan which the City has sought to terminate. Finally, the court notes that it is unseemly for the City, on the one hand, to deny subdivision approval and erect numerous barriers preventing Mr. Mocco from developing the property, and on the other hand, to tax Mr. Mocco as if the property were fully developable.

### Alternative Means of Access

The City rebuts the contention by the debtor and the findings by the City Planning Board that there is inadequate access to the property providing for proper vehicular circulation. The City argues that there are two alternative means of access to the property which the debtor's expert failed to consider. Those means are: (1) access *via* Luis Munoz Marin Boulevard to the east of the property; (2) access *via* Jersey Avenue to the west of the property. The City argues that the appraisal was required to take into consideration whether debtor's expenditure of additional capital would assist the property in achieving its best use. (*The Appraisal of Real Estate* at 280)("Physical limitations that prevent a site from achieving its optimal use may often be overcome by applying additional capital." *Id.*)

The City contends that although the subject property does not front either of those roads, the debtor could have acquired other pieces of property blocking access to those streets by virtue of unconsummated recorded "contracts" dated May 27, 1987 (Marin Blvd.) and March 14, 1984 (Jersey Avenue). In addition, the City argues that the Liberty Harbor North Redevelopment Plan includes a circulation plan which contemplates access from both of those roads.

This court disagrees with the City's position because there are numerous obstacles in obtaining access to either of the suggested "roads." Even if access were obtainable, the properties available are not large enough to provide for sufficient vehicular circulation, nor do the roads, which pass through contaminated eye-sores and dumps, provide the appropriate aesthetic needs for a residential development. The "roads" have not yet been dedicated as roads by the City, and at present, therefore, are mere parcels of vacant land which may be disposed of as the City wishes. Finally, the court disagrees with the City's premise that "additional capital" must be expended to acquire missing parcels of the assemblage in order to obtain the property's highest and best use.

### Luis Munoz Marin Boulevard

There are six obstacles eliminating Marin Boulevard as a viable source of access to the property. First, access from the property to the road is blocked by two separate lots owned by the Maritime Power Company (Lot 28E—located directly above the subject site) and by the City of Jersey City (Lot 28F—located above lot 28E). Thus the property is landlocked from Marin Boulevard.

The City argues that such obstacle could be overcome by the debtor's application of additional capital to acquire the intervening properties. (citing *The Appraisal of Real Estate* at 280). This court disagrees that the valuation is required to take such expenditure of capital into consideration. The City places too much emphasis and reads too much into one line from the Appraisal Text Book urging the consideration of such action. In fact the law in New Jersey holds the opposite.

"Property to be assessed, whatever may be its character, is to be taken and valued in the actual condition in which the owner holds it." *Highview Estates v. Borough of Englewood Cliffs*, 6 N.J.Tax 194, 200 (1983)(citing *Trustees of Stevens Inst. of Technology v. State Board of Taxes and Assessment*, 105 N.J.L. 99, 101, 143 A. 356 (Sup.Ct.1928), *aff'd*, 105 N.J.L. 655, 146 A. 919 (E. & A.1929)). "Property should be assessed in the condition in which it is utilized and the burden is on the person claiming otherwise to establish differently. Highest and best use does not necessarily require

that a property should be developed with improvements to the maximum coverage permitted by law. More important, it must be established that any proposed addition is economically feasible." *Highview Estates,* 6 N.J.Tax at 200. *See also City of Newark v. West Milford Tp.,* 9 N.J. 295, 88 A.2d 211 (1952); *Berkeley Development Co. v. Berkeley Heights Tp.,* 2 N.J.Tax 438 (1981).

The City also argues that it is not remote that the debtor could acquire the intervening property owned by the Maritime Power Company, as there is a recorded contract dated May 17, 1987 between the Power Company as seller and Van Vorst Street Associates as buyer. As stated above, the City asserts, without any proof whatsoever, that the debtor is affiliated with Van Vorst Street Associates. This court can not make such a finding.

In addition to the fact that the Maritime Power Company lot is only one of two properties which blocks access to Marin Blvd., and that there is no dedicated road on that premises, the City's argument fails because an unconsummated contract is entitled to little or no weight in the absence of key information showing the likelihood that it is capable of being enforced. As this court was not provided with a detailed description of the contract, nor a copy of it, it is unclear whether or not this 11 year old contract had any contingencies, or contained an expiration date such that a failure to close within 11 years constitutes a breach.

Under New Jersey law, unconsummated contracts containing contingencies "are not really contracts at all but are better characterized as offers or options to purchase which deserve little or no weight in the valuation process." *Linwood Properties, Inc. v. Fort Lee Borough,* 7 N.J.Tax 320, 332 (1985)(citing *N.J. Turnpike Authority v. Bowley,* 27 N.J. 549, 143 A.2d 558 (1958), *cert. denied,* 358 U.S. 927, 79 S.Ct. 312, 3 L.Ed.2d 301 (1959)("The area for collateral inquiry [involved in unconsummated contracts] is far broader than in the case of actual sales, as is also the opportunity for collusion and fraud. For such reasons, the great weight of authority declines to accentuate the element of speculation which inevitably attends an inquiry into value.")). Moreover, even if the court were to accept that the Maritime Power Company contract could be enforced, access from Marin Boulevard suffers from the other deficiencies listed below.

Second, the road ends at the top of a parcel owned by Jersey City. As admitted by the City's expert at trial, there is no dedicated road crossing lots 28E and 28F. Thus the City could sell the property to a private owner (as could Maritime Power Company) who might put the land to any legal use it saw fit. That could potentially permanently land-lock the premises. The City offered no evidence that it has or intends to dedicate lots 28E and 28F as roads.

Third, as conceded by the City's expert, Marin Boulevard is not wide enough to accommodate the four lanes which are required to handle the traffic generated by a development of Liberty Harbor North's magnitude. Thus, even if the two lots were acquired from each of their respective owners, the road could not provide adequate vehicular circulation.

Fourth, from an aesthetic point of view, Marin Boulevard is inappropriate as access for a residential development. As admitted by the City's expert, residents of the condominium development, in order to enter their homes, would have to pass by a series of significant "eyesores" such as the highly contaminated and dilapidated Flintcote Building.

Fifth, as testified by the debtor's expert, and as is evident from the numerous maps submitted into evidence, entrance through Marin Boulevard would be narrow and circuitous.

Finally, as stated above, both the Liberty Harbor North Redevelopment Plan and the City Planning Board require the main access be from Grand Street. The City Planning Board rejected proposals by Peter Mocco and JCRA that Marin Boulevard and Jersey Avenue could provide adequate access.

*Jersey Avenue*

The City also argues that access may be provided from Jersey Avenue to the subject site. The City contends that although the subject site is landlocked from Jersey Avenue, that an unconsummated contract of sale

dated March 14, 1984 between the Consolidated Rail Corporation and the debtor would provide adequate access to the condominium development. Access from Jersey Avenue, suffers from five of the six fatal defects as does access *via* Marin Boulevard.

First, access from the property to the road is blocked by a lot owned by Conrail. Thus the property is landlocked from Jersey Avenue. As discussed above, the valuation is not required to take into consideration the expenditure of funds necessary to acquire the missing parcels to the assemblage. In addition, the Conrail "contract," which is now 14 years old, is so replete with contingencies that is nothing more than an agreement to agree, and is entitled to no weight in the valuation process. *See supra* p. 454. For instance the "contract" states in underlined text that if Conrail's senior management or Board of Directors fails to approve the contract then the contract is void (p. 5). In addition, the document states in capital letters that "THIS INSTRUMENT DOES NOT CONSTITUTE A BINDING AGREEMENT." (p. 6). The contract also states that failure to deliver closing documents, pay balance of purchase price and deliver deed within certain time frames voids the contract. As the court was provided with no evidence that the contingencies were fulfilled, and the instrument thereby became a binding contract, this document is entitled to no weight at all.

Second, Jersey Avenue does not connect to the Conrail parcel, rather it ends at a separate parcel towards the top of the Conrail lot. As admitted by the City's expert at trial, there is no dedicated road in the portion of land abutting the subject property, rather it is at this time, ordinary vacant land owned by the City of Jersey City. Thus the City could sell the property to a private owner to put the land to any use it saw fit. Again, the City offered no evidence that it has or intends to dedicate the relevant portion of Jersey Avenue as a road.

Third, as admitted by the City's expert, Jersey Avenue is not wide enough to accommodate the four lanes which are required to handle the traffic generated by a development of Liberty Harbor North's magnitude. Thus, even if the Conrail lot was acquired from Conrail, the road could not provide adequate vehicular circulation.

Fourth, from an aesthetic point of view, Jersey Avenue also is inappropriate as access for a residential development. As admitted by the City's expert, that portion of Jersey Avenue passes by some of the most contaminated property in the State of New Jersey, including the former Aetna building[19], as well as the Schiavone scrap yard described above. By contrast, the access proposed in the Liberty Harbor North Redevelopment Plan, was a newly constructed four-lane road, intersecting Grand Street and entering directly into the premises with unobstructed views of the Statue of Liberty.

Finally, as stated above, both the Liberty Harbor North Redevelopment Plan and the City Planning Board require that the main access be from Grand Street, not Jersey Avenue. Jersey Avenue was intended to be only an ancillary means of egress.

In light of the above referenced legal obstacles to obtaining use of the property as a multifamily residential development, this court finds that the City's proposed use of an 1,880 unit condominium development is not legally possible and does not satisfy the first prong of the "highest and best use" test.

### 2. *Physically Possible*

In determining whether a use is physically possible, "[s]ize, shape, area and terrain effect the uses to which land may be developed." *Schimpf,* 14 N.J.Tax at 344. "The utility of a parcel may depend on its frontage and depth. Irregularly shaped parcels may cost more to develop and, when developed, may have less utility than a regu-

---

**19.** The City's expert testified that a Jersey City Medical Center is to be developed directly across the street on the Jersey Avenue side of the subject site. The expert contends that development of this center will change the undesirable nature of that environment. However, the City's appraiser also testified that this medical center had been proposed for many years and no construction has yet been undertaken. In addition, the City still has not dedicated the portion of Jersey Avenue which would service this Medical Center. Thus the court finds such testimony concerning the medical center mere speculation.

larly shaped parcel of the same area." *Six Cherry Hill, Inc. v. Tp. of Cherry Hill,* 7 N.J.Tax 120, 132 (1984). A proper determination of highest and best use cannot be made without consideration of those physical factors. *Schimpf,* 14 N.J.Tax at 344.

In *Schimpf,* the tax court found that the municipality failed to consider such physical factors as it did not submit or make reference to any survey or topographical map, nor did the expert testify that he actually walked the land. *Id.* Furthermore, "[t]here was no wetlands investigation or delineation of the property in order to ascertain the extent of land, if any, actually available for subdivision and development." *Id.* at 347. Thus the court found that the municipality's arguments amounted to "little more than speculation that the property may accommodate an additional use." *Id.*

In this case the development is not physically possible. As stated above, the property is landlocked from all roads. Thus there is no physical way for a resident to get to the property on a proper roadway, and without crossing private land. Second, the Liberty Harbor Redevelopment Plan requires that the development consist of approximately 75 acres of land. At present, the assemblage consists of only 44.01 acres. Third, the Plan requires construction of homes physically fronting on Grand Street. The subject property physically lies south of (and does not front) Canal Street which is one block south of Grand Street. Thus no buildings can be constructed on debtor's land, which fulfill the requirement of Grand Street frontage. Fourth, as indicated in the Paulus, Sokolowski and Sartos Engineering Report, the property consists of former wetlands, which had been filled-in. As such, the Engineering Report concludes, the soil density is insufficient to support the multi-family residential buildings proposed in the Liberty Harbor North Redevelopment Plan. Fifth, the property is contaminated with hazardous substances, which must be remediated (at an estimated cost of $15–$20 million) before any residential homes may be constructed on the land. (*See infra* for a discussion of remediation requirements.) To date, no remediation has occurred, nor is there any plan in prospect.

Finally, as indicated above, the development requires roadways of four lanes to provide proper vehicular circulation. There are no roadways, accessible to the property, which are adequate in size.

As such the court finds that the City did not meet its burden as to physical possibility.

### 3. *Economic Feasibility*

Economic feasibility is an additional requirement which must be met in order for the property to meet the "highest and best use" test. In proving feasibility a municipality should provide evidence to show development is "economically feasible under the market conditions existing in the area." *Schimpf,* 14 N.J.Tax at 347. For example the municipality should prepare a feasibility study or market analysis to show the need for an additional proposed facility in the township. *Id.* In addition costs of permits and remedial work should be factored in. *Id.* at 348. Moreover, expense and cost of subdivision should be considered. *Id.*

In this case, the City argued that the proposed use was economically feasible in light of the rampant development in other parts of Jersey City. The City's expert pointed to various developments, such as Porte Liberte and Hovnanian. However, upon cross-examination it was revealed that almost every development referred to by the City had undergone either bankruptcy, foreclosure, or some other type of financial demise. Notably, the City was unable to point to a single development in the Liberty Harbor North Redevelopment Zone. While other parts of Jersey City may be undergoing a "renaissance" at the present time, it is the status of the Liberty Harbor North Redevelopment Zone during the assessment periods which impresses this court. As expressed above, the prospect for large scale redevelopment of that particular area, is, at present, quite dismal.

As to the economic feasibility of the subject site, the City made no argument at all concerning financial aspects of the proposed use of the property. As in the *Custom Distribution* case, 216 B.R. 136, this court recognized that it should not require a level of proof so burdensome and costly as to be

unrealistic; however, again, in the instant case there was no specific testimony as to how this project would be financed, and in turn how it would be financially feasible.

The Debtor on the other hand, argued that the environmental risks affecting the subject property impair the subject's ability to achieve its highest and best use. Although the environmental impairment does not interfere with the subject's ability to generate income from the existing, habitable structures such as the marina, Debtor asserts that it is unrealistic to assume the property can be renovated, expanded, sold or financed as impaired.

This court agrees that the proposed use of the vacant land faces serious obstacles in securing financing or achieving economic feasibility. As stated below, the $15–$20 million remediation of the environmental contamination on the property is a prerequisite for the evaluation of the land at the highest and best use urged by the City. *Schimpf,* 14 N.J.Tax at 348. *See also United Jersey Bank–Peoples Trust of New Jersey v. Lincoln Park,* 11 N.J.Tax 549 (1991)(In determining whether a property met the "highest and best use" test, the court indicated, that the "[r]ealization of any additional development potential therefore depends upon regulatory approval that cannot be assumed.")(citing *Six Cherry Hill, Inc. v. Cherry Hill Tp.,* 7 N.J.Tax 120, 129 (1984), *aff'd,* 8 N.J.Tax 334 (App.Div.1986); *Custom Distribution,* 216 B.R. at 158.)[20] In this case there has been no showing that EPA or NJDEP would authorize the development of this land in light of the significant cleanup that has yet to be undertaken.

In addition, the remediation is a prerequisite for refinancing, as the Industrial Site Recovery Act ("ISRA") N.J.S.A. 13:1K–6 to –14, does not permit the transfer of an interest (i.e. a transfer of security interest, required by most financing institutions) in contaminated property until clean-up is complete. *Custom Distribution,* 216 B.R. at 158 (citing N.J.S.A. § 13:1K–6 to 14 and *Inmar,* 112 N.J. at 603, 549 A.2d 38). The City has not indicated how this remediation would be

financed or whether the remediation would occur. Furthermore, the prospects for potential liability for the clean-up costs associated with the hazardous materials impacts the ability to find financing.

In addition, there will be staggering costs associated with attaining the remaining portions of the assemblage and overcoming the regulatory problems discussed above. It is unclear whether the improperly blighted property will ever be acquired. For the past ten years, a court order mandating the return of those properties to the original owners stands, with no attempt made by the City to correct its defective action. According to the Redevelopment Plan, acquisition of blocks 233 and 268 are a *sine qua non* for proceeding with this project. Similarly, such land is an absolute prerequisite for approval of subdivision by the City Planning Board. It is likely that an investor would command a high rate of return to off-set the significant risks associated with such contingencies. That event would make economic feasibility ever more elusive.

Thus this court finds that it is not financially feasible to develop the vacant site at present because a positive return to the land can not be obtained. *See United Jersey Bank–Peoples Trust of New Jersey v. Lincoln Park,* 11 N.J.Tax 549, 558 (1991)(highest and best use test was not met where it was "not shown that any particular use to which the property might be put would be economically profitable. No analysis has been made either of costs of development and construction or the need for and potential return from any given kind of development. Defendant's argument amounts to little more than speculation ..." *Id.*).

The court agrees with Debtor's assessments of the prospects for financing and finds that the City has not met its burden as to economic feasibility.

### 4. Profitability

 Again, the City offered no analysis as to whether the proposed use would be

---

**20.** In *United Jersey Bank–Peoples Trust,* 11 N.J.Tax 549 (1991), the court found that the highest and best use test was not met because,

*inter alia,* defendant had made no showing as to the likelihood of flood zone approval. *Id.* at 558.

profitable. This court agrees with Debtor that since developing the site is not financially feasible at this time, the maximally productive use and highest and best use of the land as vacant is to remain so and to hold for future development. Only a speculator would have an interest in the undeveloped lands of the subject property.

In sum, the court finds that the City has not satisfied the four prong test for highest and best use, as it has not met any of the four prongs showing that the proposed use is legally, or physically possible, economically feasible or profitable. Its development potential at this time is merely speculative and accordingly, its value as if developed may not be added to the value of the parcel of land as it is currently being used. As stated above, the proposed use of the land must bear some relationship to reality. At this time, the property is no more than an incomplete assemblage of land, which is landlocked, has no access to roadways for vehicular circulation, suffers from environmental contamination, has had two applications for subdivision denied, and where the City of Jersey City seeks to terminate the very contract which provides the legal authority for its development. As such, the site faces so many obstacles as to make the large scale development nothing more than a dream. *See Schimpf,* 14 N.J.Tax at 344 ("Ultimately, highest and best use valuation has as a prerequisite a probability of achievement... The projected use cannot be remote, speculative or conjectural." *Id.*).

## II. Sales Comparable Methodology

### Per Unit Approach to Valuation

■ The City argues that the debtor's expert erred by employing a "per acre" approach to valuation. The City contends that the proper methodology is to value the property on a "per unit" basis. The City cites numerous cases standing for the proposition that "land **sold for multi-family residential** use is valued in the market by the number of units that can be constructed on the land." *Frieman v. Randolph Tp.,* 8 N.J.Tax 264 (1980), *aff'd,* 216 N.J.Super. 507, 524 A.2d 453 (App.Div.1987), *appeal dismissed,* 110 N.J. 294, 540 A.2d 1276 (1988)(emphasis added)

(land was sold for multi-family residential development); *Berkley Arms Apartment Corp. v. City of Hackensack,* 6 N.J.Tax 260 (1983)("per unit" approach is appropriate depending upon how the property is actually utilized); *Sage v. Bernards Tp.,* 5 N.J.Tax 52 (1982), *aff'd,* 6 N.J.Tax 349 (App.Div. 1984)(same); *Romulus Development Corp. v. Weehawken Tp.,* 15 N.J.Tax 209 (App.Div. 1995)(same).

The court has reviewed the above cited authority. In each of those cases, the "per unit" approach was adopted over the more traditional "per acre" (for vacant land) or "per square foot" (for a leased building), only where the land was valued for a multi-family residential use. In this case, the court has found that the highest and best use is not for multi-family residential use but to hold the vacant land for future development. Accordingly, the "per unit" approach is rejected, and the traditional "per acre" method, as proposed by debtor's expert is accepted.

### Debtor's Comparables

The City also contests the debtor's comparable sales employed by the appraiser in the sales comparable approach. The City's argument is twofold. First, the City objects to the actual comparables used by debtor's expert. Specifically, the City objects to the expert's use of sales of the subject property (which pre-date the assessment period by four years), and further that the expert placed most weight on those transactions. In addition, the City contends that there were insufficient adjustments made to those sales. Second, the City argues that the debtor should have examined properties which were used for large scale multi-family residential development instead of focusing solely on properties within the Liberty Harbor North Redevelopment Zone.

■ In analyzing market data in a sales comparable approach, evidence of comparable sales are relevant only where there are substantial similarities between the subject property and the property to which it is being compared so as to admit a reasonable comparison, and provide for reasonable adjustment. *Venino v. Borough of Carlstadt,* 1 N.J.Tax 172 (1980), *aff'd,* 4 N.J.Tax 528 (App.

Div.1981); *Congoleum Corp. v. Hamilton Tp.*, 7 N.J.Tax 436 (1985). As stated by the New Jersey Supreme Court:

> Comparable sales include all sales that will lend logical, coherent support if they show comparable building density ratios, functional similarities, proximity of sales dates to assessing dates, similarity of age, construction and conditions, and in some cases, size.

*Ford Motor Co. v. Tp. of Edison*, 127 N.J. 290, 308, 604 A.2d 580 (1992).

"The selling price of the subject 'is a guiding indicium of fair value and ordinarily is merely evidential although it might under peculiar circumstances become controlling, subject to the limitation that the determination properly involved the weighing and appraising of all component factors and adventitious circumstances.'" *Romulus Devel. Corp. v. Town of West New York*, 7 N.J.Tax 305 (1985), *aff'd sub. nom Romulus Dev. Corp. v. Weehawken Tp.*, 9 N.J.Tax 90 (App.Div.1987)(citing *Hackensack Water Co. v. Div. of Tax Appeals*, 2 N.J. 157, 162–63, 65 A.2d 828 (1949) and *L. Bamberger & Co. v. Div. of Tax Appeals*, 1 N.J. 151, 62 A.2d 389 (1948)); *see also Sage v. Bernards Tp.*, 5 N.J.Tax 52, 67 (1982).

▇ In particular, New Jersey courts have found that where a property is unique, the sale of the subject may be the most reliable comparable sale. *Romulus Devel. Corp.*, 7 N.J.Tax at 317. The *Romulus* opinion involved a case where the tax court found that the appraiser's reliance upon sales of the subject property was proper. *Id.* That case is strikingly similar, factually, to the instant case.[21] In *Romulus*, as in the instant case, the sale was an arm's length, negotiated transaction between knowledgeable, unrelated parties for an all-cash consideration. *Id.* In this case, the property was valued by two separate appraisers[22] and debtor paid

the appraised value of the land. Furthermore, prior to the purchase by Peter Mocco, the land was marketed. Thus, as in *Romulus*, the sale of the subject was an arms length transaction for fair market value. In addition, the *Romulus*, sale of the subject was accomplished by bargain and sale deed without covenants against grantor's acts, the buyer's payment of one-half of the realty transfer fee, and the culmination of the sale without protracted negotiations. *Id.* at 317–18. However, those factors did not dissuade Chief Judge Lasser from the opinion that the sale of the subject was the most appropriate comparable. *Id.* This court similarly, is not impressed that the debtor took the property subject to environmental contingencies.

More significantly, in *Romulus*, Chief Judge Lasser found that the subject property was "unusual." *Id.* Some of the unusual features of the property were that it was a large parcel of land in close proximity to New York City. In addition:

> "[i]ts subsurface conditions require expensive foundations. The lengthy waterfront will necessitate expensive bulkheading. A portion of the property is Palisades cliffs. There is limited access, and the portion of the property subject to an easement granted to the Port of New York and New Jersey Authority cannot be built over."

*Id.*

Thus, the court concluded, "[t]he subject property is an unusual parcel of land, and therefore, its sale is a more reliable indicator of its value than are sales of waterfront properties that are smaller in size, have differing characteristics and are located in other municipalities." *Id.* (citing *Halocarbon Products v. South River Borough*, 1 N.J.Tax 294, 302 (1980), *aff'd*, 181 N.J.Super. 1, 436 A.2d 532 (App.Div.1981)(sale price of subject held best evidence of market value after "weighing and appraising of all component

---

**21.** The only difference between the *Romulus* case and this case, is that the sale of the subject property in *Romulus* occurred closer to the assessment date, than did the sales of the properties in this case to Peter Mocco. However, as testified by debtor's expert, without contradiction, there have been no sales in the Liberty Harbor North Redevelopment Zone since the sales of the subject property.

**22.** Debtor's expert also testified that one appraiser for the subject site, as the tax assessor for the City, had a "rosy view" of property values in Jersey City. Thus the appraised value was probably not only fair market value, but may have been slightly high.

factors and adventitious circumstances.")). The court found that the sale of the subject property was the best evidence of the market value of the land. Accordingly, the court approved that the expert relied most heavily on the subject sale which constituted only two of the 14 waterfront properties he considered. *Id.*

■ The description of the unique qualities of the *Romulus* property almost mirrors those of the property in the instant case. The subject site, similarly is situated on land which has problems with the subsoil conditions, due to its status as filled-in land, is located on a waterfront, and also suffers from lack of access and portions of the assemblage which are essential to the development of the subject site (blocks 233 and 268) have been illegally blighted and must be returned to the original owners. Thus they may not be built upon at this time. This property is also unique, as it is part of a specific redevelopment zone, which is subject to and regulated by a very site specific and detailed redevelopment plan. The Liberty Harbor North Redevelopment Plan contains numerous restrictions and conditions, and applies only to properties located within the redevelopment zone, and no other properties. Accordingly, this court finds that the property is unique and that the sales of the subject property to Peter Mocco are the best indicia of the market value of the subject property. Mr. Blau's heavy reliance upon the subject sales is appropriate.

### The City's Comparables

■ The City submits that its comparables consisting of large scale developments in other areas of Jersey City are the sales which best reflect the market value of the subject site. The debtor objects on the grounds that the subject site is unlike the City's comparable sales, in that the subject site does not have large scale development as its highest and best use, due to all of the obstacles which face redevelopment of the subject that did not effect the other sales.

■ Under New Jersey law, comparable sales are not entitled to probative weight where the highest and best use of the comparables is different from that of the subject property. *Sage v. Bernards Tp.,* 5 N.J.Tax at 67 (citing *Filcrest Realty, Inc. v. Edison Tp.,* 2 N.J.Tax 77 (1980); *Town of West Orange v. Goldman's Estate,* 2 N.J.Tax 582 (1981)). Thus if residential construction is permitted on one site and prohibited on the other, or if one comparable property is served by a certain amenity (such as sewers or roads), but the subject is not, "the putative comparables provide no meaningful comparison with the subject." *Town of West Orange v. Goldman's Estate,* 2 N.J.Tax at 588.

In this case, the highest and best use of the City's comparables was for large scale residential development. The City's comparable properties all had subdivision approvals in place, or were contingent upon those approvals. In this case, subdivision applications have twice been denied. In addition, pursuant to the Liberty Harbor North Redevelopment Plan, no development may proceed until the property fronting Grand Street (illegally blighted property) is acquired. The subject site is also landlocked and has no access to adequate roadways. Such was not the case with the City's comparables. Accordingly, this court finds that the City's comparables provide no meaningful basis for comparison with the subject site.

### Conclusion as to Sales Comparison Approach

This court finds that the sales comparison approach is the appropriate method of valuation for the vacant land. The highest and best use of the property is for development from 1986 through 1987; and to hold for future development from 1988 through 1996. Accordingly, the proper methodology for valuation is a "per acre" approach for years 1988 through 1996. The court accepts the debtor's expert's comparables, and finds that Mr. Blau was correct when he placed heaviest weight upon sales of the subject site. The court also accepts Mr. Blau's adjustment for time and market conditions as the figures set forth by both parties were essentially the same. In addition, the adjustment for time and market conditions was not contested in the post-trial memorandum of the City, and

the cross-examination of Mr. Blau on this point was ineffective.

## VALUATION OF THE MARINA

The City conducted no independent valuation of the marina, arguing that the marina should be demolished in order for the property to achieve its highest and best use. Instead, the City attacked the debtor's use of the cost approach in valuing the marina. The City asserts that the cost approach is not to be used in valuation unless no other method can be employed. The City also made subsidiary arguments that in conducting the cost approach the debtor used the incorrect land value, did not use actual, but rather projected costs of construction and that the debtor did not explain why it chose the lower end of the Marshall & Swift range of costs, nor did the debtor employ the local multiplier, to customize the national Marshall & Swift data to the particular market.[23]

In New Jersey, the decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts. *City of New Brunswick v. Div. of Tax Appeals,* 39 N.J. 537, 189 A.2d 702 (1963). As stated by the New Jersey Supreme Court, "[t]he Constitution does not contain any fixed standard of fairness by which it must be measured. Courts have been careful not to reduce the concept to a formula." *Jersey City Redevelopment Agency v. Kugler,* 58 N.J. 374, 378–79, 277 A.2d 873 (1971).

The New Jersey "courts have consistently refrained from mandating that a specific methodology be used in appraising condemned property. For example, in *Mehlman, supra,* 118 N.J.Super. at 587, 289 A.2d 539, the court declined to designate which method of appraisal should have been used, stating that an appellate court should determine only whether the method used at trial was reasonable." *State v. Caoili,* 135 N.J. 252, 270–71, 639 A.2d 275 (1994)(deciding appraisal methodology within the context of condemnation case). "[T]here is no precise

and inflexible rule for the assessment of just compensation." *Id.* at 271, 639 A.2d 275.

Although, the cost approach is not a favored valuation method, there are instances in which it is appropriate that such an approach should predominate, *Coca–Cola Bottling Co. v. Neptune Tp.,* 8 N.J.Tax 169, 176 (1986). The decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts. *Id.* The City argues as if the cost approach is never appropriate. However, as stated by the Court of Errors and Appeals: "[T]he basic weakness of this attack is that prosecutors proceed on the theory that exchange value or market value is the invariable test of true value under all circumstances. This is not so." *City of Newark v. Tunis,* 82 N.J.L. 461, 81 A. 722 (E & A 1911).

The New Jersey Courts have generally accepted the cost approach to valuation in two circumstances. The first circumstance is where the property is a specialty or unique property for which there is no market data. *See Berkley Arms Apt. Corp. v. City of Hackensack,* 6 N.J.Tax 260, 271 (1983); *Dworman v. Borough of Tinton Falls,* 1 N.J.Tax 445 (1980), *aff'd,* 180 N.J.Super. 366, 3 N.J.Tax 1, 434 A.2d 1134 (App.Div.1981), *cert. denied,* 88 N.J. 495, 443 A.2d 709 (1981); *Harborside Warehouse Co., Inc. v. Jersey City,* 128 N.J.L. 263, 265, 25 A.2d 291 (Sup. Ct.1942), *aff'd,* 129 N.J.L. 62, 28 A.2d 91 (E & A 1942), *cert. denied,* 318 U.S. 769, 63 S.Ct. 76387 L.Ed. 1140 (1943).

The second situation where the cost approach has been approved by the courts, is where there was no testimony on any other methodology (i.e. income capitalization approach or sales comparable approach); or where the most reliable testimony was that involving the cost approach. *See Coca–Cola Bottling Co., Inc. v. Neptune Tp.,* 8 N.J.Tax 169, 176 (1986)(the court rejected the income capitalization method of the defendant and the sales comparable approach of the plaintiff

---

**23.** The City also attacks the debtor's methodology in employing the income capitalization approach for the marina. However, as acknowledged by the debtor's appraiser, the income capitalization approach was truncated and not intended to be relied upon, but rather only employed as a check against the cost approach.

because both were flawed. The court justified its acceptance of the cost approach by stating, "[t]he Tax Court has indicated that the cost approach may predominate if the proofs submitted in support of that approach are more reliable than those submitted in support of any other approach.") *Id.* (citing *ITT Continental Baking Co. v. East Brunswick Tp.*, 1 N.J.Tax 244 (1980)). *See also Pennwalt Corp. v. Holmdel Tp.*, 4 N.J.Tax 51, 61 (1982)("Although the taxpayer's witness emphasized the market approach, the court concludes that, because of the weaknesses in that approach, in this case the cost approach should predominate." *Id.*).

█ Although the debtor's expert testified that he used the cost approach because of the unique nature of a marina enterprise, this court is not convinced that a marina is so unusual that it is incapable of comparison to market data. Rather this case falls into the second category which permits the cost approach where the proofs submitted in support of that approach are more reliable than those submitted in support of any other approach. In the instant case the City submitted no valuation of the marina at all. The debtor's expert employed a thorough cost approach valuation and an abbreviated income capitalization valuation as a check.

While the court may have preferred the income capitalization or sales comparison approach to valuing the marina, no such proper valuation was submitted by either the City or the debtor. The income capitalization approach conducted by the debtor was incomplete by the debtor's expert's own admission. By comparison, the cost approach employed a detailed analysis utilizing market data for a land value and a standard universally recognized manual for costs. Thus the most reliable analysis of value submitted to the court through competent testimony and evidence is the cost approach method of valuing the marina enterprise. Accordingly, the court accepts debtor's methodology for appraising the marina.

The cost approach to valuation is determined by:

[A]dding the estimated value of the land to the current cost of constructing a reproduction or a replacement for the improvements and then subtracting the amount of depreciation (i.e. deterioration and obsolescence) in the structure from all causes. Profit for coordination by the entrepreneur is included in the value indication.

\* \* \* \* \* \*

Depreciation is measured through market research and the application of specific valuation procedures. Land Value is estimated separately in the cost approach.

*Appraisal of Real Estate* at 80.

The debtor separately estimated the land value of the property by surveying ten comparable properties, four of which were the sale of the subject site. The City objects to the comparables used by debtor's expert in determining the land value in that they failed to take into consideration the highest and best use of the land. As held by this court above, the use by debtor's expert of sales of the subject site is appropriate to determine the value of the land, given the special features of the premises and its highest and best use.

█ The City also objected to the costs determined by the debtor's appraiser. The City asserts that the debtor did not use actual, but rather projected costs of construction from the Marshall & Swift manual. This court finds that the Marshall & Swift valuation service is an appropriate, widely-used and accepted source for determining costs. *See ITT Continental Baking Co. v. Tp. of East Brunswick*, 1 N.J.Tax 244, 248 (1980)(Marshall & Swift manual used to derive costs of construction in cost approach); *Coca–Cola Bottling Corp.*, 8 N.J.Tax at 174 (same); *Berkley Arms Apt. Corp.*, 6 N.J.Tax at 273 (same).

The City also argues that the debtor did not use the local multiplier to bring the Marshall & Swift costs into line with the local market. This statement is incorrect. In fact, the Blau Appraisal indicates that a local multiplier of 1.24 was used to increase the Marshall & Swift cost of $3,250 per slip to $4,030 per slip. (Blau App. at p. 41). Mr. Blau also testified at trial as to his use of the local multiplier.

The City further contends that the debtor did not explain why it chose the lower end of the Marshall & Swift range of costs. As a preliminary matter, the court notes that the debtor could have used the Real Property Appraisal Manual, which is an accepted source of costs and generally yields low cost estimates. *See ITT Continental Baking Co.,* 1 N.J.Tax at 253. However, the debtor chose Marshall & Swift which provides higher costs. *Id.* Thus the debtor's starting point for the cost estimates is higher. Furthermore, Mr. Blau did explain why he chose the lower end of costs. At trial, Mr. Blau indicated that the debtor was not attempting to construct a long range marina enterprise, rather he hastily installed low quality boat slips with low grade materials (such as untreated pilings) to create a quick cash flow to help sustain the property during the time that redevelopment was stalled.

In addition, the City objects that Mr. Blau did not question Mr. Mocco as to whether his summary of costs was complete. During cross-examination, the City's counsel questioned Mr. Blau as to whether he asked Mr. Mocco if the costs included overhead and profit. The City argues that Mr. Blau's assumption that the debtor supplied complete information was imprudent. This court finds that while it may have been more prudent for Mr. Blau to follow up with questions to Mr. Mocco concerning the accuracy and completeness of the supplied information, given Mr. Mocco's experience and knowledge about real estate matters, it was not fatal error to rely on his submission as correct and complete. Further, the City provided no evidence to this court that the figures were incorrect, nor did the City point to any specific cost which was omitted.

Finally, the City argued that Mr. Blau offered no explanation for his choice of depreciation value. As stated above, depreciation is the loss in value from any cause over a period of time. In particular, physical depreciation is evidenced by wear and tear. This court is satisfied with Mr. Blau's explanation that he chose the ten year depreciation figure based upon his assessment of the type of construction and quality of materials used to construct the marina. As stated by Mr. Blau, typical marinas have an expected life of 20 years. However, the subject marina was made with untreated pilings which deteriorate at a more rapid rate; and one could not anticipate that they would last longer than ten years.

As to the buildings associated with the marina, the City objects that Mr. Blau did not use the local multiplier to adjust the Marshall & Swift manual costs. Again, the City failed to examine the appraisal closely, because indeed, the local multiplier of 1.24 is applied to the building costs raising the cost per square foot from $27.08 for three of the buildings to $33.58 per square foot. The local multiplier also caused the price per square foot to rise from $60.28 per square foot to $74.75 for the restaurant. (Blau App. at p. 42).

The City also contends that Mr. Blau did not fully discuss the type of construction and physical condition of the out-buildings. The appraisal, however, does describe the four buildings. The 4,000 square foot and 800 square foot buildings were constructed of concrete block in 1930. The 1,200 square foot building is brick and frame also constructed in 1930. *Blau App.* at 31. The 3,600 square foot building, used as the restaurant, is a frame building. The buildings had no value at the time of purchase; they were, however, quickly and inexpensively "fixed" in 1993 as an interim use in connection with the marina. *Id.* In addition, Mr. Blau supplied the court with photographs of the various buildings. *Id.* at 4–8. The court is satisfied with this description, particularly in light of the fact that the City has offered no information whatsoever concerning the marina buildings.

In conclusion, this court finds that the cost approach is appropriate to value the marina and the associated buildings and that the Marshall & Swift manual is an appropriate source for costs. In addition, the court finds that Mr. Blau did use the local multiplier, explained his choice of cost estimates and satisfactorily justified his choice for depreciation. Finally, the court approves of the use of sales of the subject property as comparable sales. The court approves of the valuation of the marina as set forth above.

### B. Adjustment to Value of the Property for Environmental Contamination and Remediation

Debtor's appraisal seeks a 75% deduction from value to reflect the environmental contamination on the site. The appraisal categorizes such deduction almost as an adjustment to the comparable sales to account for the effect of contamination on market value. In its post-trial brief debtor characterizes the deduction as one for stigma. The City objects, citing *Inmar*, 112 N.J. 593, 549 A.2d 38 (1988), that a deduction for environmental contamination is inappropriate and in violation of the New Jersey constitution's mandate that the property be valued at true value.

Under New Jersey law, a valuation methodology may make some adjustment for environmental contamination. As discussed by this court in *Custom Distribution*, 216 B.R. at 153, there are severe constitutional limits on how those adjustments may be made. An appraisal may not simply deduct the cost of cleanup from a putative value of the property. *Inmar*, 112 N.J. at 605, 549 A.2d 38. As discussed in *Inmar*, clean-up of environmental contamination is the responsibility of the landowner, and it may not be passed on to the new owner or to the public. *Id.* (citing Environmental Cleanup Responsibility Act ("ECRA")(now designated the Industrial Site Recovery Act ("ISRA") N.J.S.A. 13:1K–6 to –14)). Accordingly, a property owner may not benefit from its failure to satisfy its obligation to remediate the site by claiming a reduction in true value. *Id.*

The limited circumstances where environmental contamination may be recognized under *Inmar*, as was recognized by this court are only where the income capitalization approach to valuation is employed. *Custom Distribution*, 216 B.R. at 153; *Inmar*, 112 N.J. at 608, 549 A.2d 38. In the income capitalization approach, an income stream is calculated. *Inmar* recognized that such income stream would be encumbered by the cost of clean-up. Thus *Inmar* permitted a straight depreciation of costs of clean-up over the remediation period. 112 N.J. at 608, 549 A.2d 38. This is no different than any other expense reducing the income produced by the property in a normal income capitalization valuation.

The other area for recognition of environmental contamination *when the income capitalization approach is employed* is a deduction for stigma. *Custom Distribution*, 216 B.R. at 153 (citing *Inmar*)(20% deduction permitted for stigma of Superfund site where income capitalization approach was utilized.). Because of the constitutional constraints noted by the New Jersey Supreme Court concerning deductions in value for environmentally contaminated property this court is hesitant to extend that ruling beyond that which was clearly articulated in *Inmar*, 112 N.J. 593, 549 A.2d 38. Since the debtor did not use the income capitalization approach, but rather the sales comparable and cost approach to valuation, this court declines to allow a 75% deduction in value to the subject property for stigma or clean-up costs.

### Adjustments to Sales Comparables to Reflect Physical Condition of Property as Contaminated.

*Inmar* did not change the standard practice of appraisal methodology when employing the sales comparison approach in making adjustments for differences in physical condition of the property. The City makes no argument on this point, nor does the debtor. However, to the extent that debtor's appraisal can be construed to characterize the 75% deduction as an adjustment to sales comparables this court will consider that position here.

As stated above, the sales comparison approach compares the subject property to similar properties that have been recently sold or listed for sale in the same or competing areas. Upward or downward adjustments to the price per square foot of the comparable properties are made to account for the differences, such as physical condition, between the subject property and the sales comparables. *See In re 865 Centennial Avenue Associates*, 200 B.R. 800 (Bankr.D.N.J.1996). In analyzing market data in a sales comparison approach, evidence of comparable sales are relevant where they provide for reason-

able adjustment. *Venino v. Borough of Carlstadt*, 1 N.J.Tax 172 (1980).

The issue that concerns this court is whether the appraisal may make an adjustment for physical condition, where that condition is environmental contamination. *Inmar* suggests that where the property is not in use and subject to valuation by way of income capitalization approach, that the appraiser classify the contaminated property as a "special use property" where there is no market for the premises. *Inmar*, 112 N.J. at 606, 549 A.2d 38. *Inmar* advised appraisers to "view these properties as they do special purpose properties using a measure of flexibility that will aid in the determination of the "true value" of contaminated properties." *Id.* Thus it would appear that it is the appraiser's task in the first instance (if possible) to compare the subject site with other sites which contain similar levels of environmental contamination. In such a case, adjustments for physical condition would appear to be unnecessary. *Inmar* does not deal with drastic adjustments for physical condition where the appraiser compares the subject site to sales of properties which were clean.

In this case, the appraiser, in fact, compared the subject property to properties which were contaminated. As stated, the appraiser relied most heavily (indeed exclusively) upon the sales of the subject site. In addition, this court adduced from the testimony that the other comparable sales submitted by the appraiser were also contaminated. Thus it would appear that no 75% deduction for physical condition attributable to environmental contamination is warranted.

The debtor, however, argues that the market value of the property, which was purchased in 1984, did not reflect concern for environmental contamination. Debtor contends that the environmental laws were new and that there was no concern or understanding of the potential liability associated with contamination. Debtor further states that purchasers routinely accepted broad environmental indemnity clauses, without any effect on price. Thus, debtor asserts, it is entitled to a deduction in value, even though the comparable itself was contaminated.

This court disagrees that environmental concerns were of such insignificance in 1984 as to have no effect on market value. As a preliminary matter, this court notes that the environmental laws, referred to by debtor were in fact in enacted into law and in full force and effect in at the time the contract to purchase the land was executed by the debtor. *See supra* pp. 450–51.

Furthermore, the evidence presented to the court shows that not only the seller of the property, but other participants in the Jersey City real estate market had an understanding of the newly enacted environmental laws and the potential liability associated with remediation of environmental contamination. The various contracts and settlement entered into by the debtor and JCRA and ERS contained sophisticated environmental indemnity clauses referencing the relevant environmental laws and exhibited an understanding of the different types of potential liability.

Thus, this court finds that both the purchaser (Mr. Mocco) and seller of the subject site were or should have been aware of the existence of the potential liability for the environmental contamination. Indeed, the assertion that buyers and sellers were unaware of environmental issues at the time is belied by the sophistication of the environmental indemnity clauses of the contracts and settlements, and the fact that the indemnity clause was amended. Moreover, other developers in the area had remediation plans in place at the time of the sale of the subject site. As a sophisticated and successful real estate developer, Mr. Mocco can be charged with the knowledge and expertise of other major developers in the area. Accordingly, the sales of the subject site reflect the proper market price of the land, *as contaminated*, with no adjustments to value permitted for physical condition.

## CONCLUSION

For all of the above reasons, this court finds that debtor has rebutted the presumption as to the correctness of the City of Jersey City's tax assessment. The court will exercise its discretion under 11 U.S.C. § 505 to review assessments for tax years 1984 and

1996 as the parties have not disputed those tax years, they are not too remote, and the debtor has rebutted the presumption of correctness. The court finds that the proper standard of review for tax assessments is "true value" of the property, and the methodology of valuation to determine such value is the sales comparable approach for the vacant land and cost approach for the marina and associated buildings. Attendant to such finding, the court holds that the highest and best use of the property is for development from 1985 to 1989 and thereafter to hold in its present condition for future development and operate the marina to generate some cash flow to support the property. The court also finds that the debtor is not entitled to deduct the cleanup costs of the environmental contamination nor is the property's value entitled to a 75% adjustment for either the stigma of the property or for its physical condition. As such, the court finds that the proper valuation of the property and the assessed value is as follows:

| Market Valuation Date | Tax Year | Total Valuation |
| --- | --- | --- |
| October 1, 1985 | 1986 | $611,600 |
| October 1, 1986 | 1987 | $886,600 |
| October 1, 1987 | 1988 | $1,204,850 |
| October 1, 1988 | 1989 | $1,388,300 |
| October 1, 1989 | 1990 | $1,238,500 |
| October 1, 1990 | 1991 | $1,007,000 |
| October 1, 1991 | 1992 | $1,370,300 |
| October 1, 1992 | 1993 | $1,523,000 |
| October 1, 1993 | 1994 | $1,411,900 |
| October 1, 1994 | 1995 | $1,289,600[24] |

Counsel for debtor shall submit an appropriate form of order within ten (10) days.

[24]. Although the parties agreed that tax year 1996 would be included in this tax appeal, no evidence was submitted to this court as to the value of the property on the relevant assessment date, October 1, 1995. Without any data concerning value, this court cannot ascribe a figure to the property for tax year 1996, even though trial proceeded with respect to that period.