**In the Matter of CHIPMAN–UNION, INC., Debtor.**

**Chipman–Union, Inc., Movant,**

v.

**Greene County, Georgia, Respondent.**

**No. 01–31418 RFH.**

United States Bankruptcy Court, M.D. Georgia, Athens Division.

Nov. 1, 2002.

William D. Matthews, J. Michael Lamberth, Atlanta, GA, for Movant.

David C. Moss, Lawrenceville, GA, for Respondent.

## *MEMORANDUM OPINION*

ROBERT F. HERSHNER, Jr., Chief Judge.

Chipman–Union, Inc., Movant, filed on August 9, 2002, its Amended and Restated Motion for Determination of Tax Liability Under 11 U.S.C. § 505. Greene County, Georgia, Respondent, filed a response on August 27, 2002. Movant's motion came on for a hearing on August 27, 2002. The Court, having considered the evidence presented and the arguments of counsel, now publishes this memorandum opinion.

Movant was a textile manufacturer. Movant operated facilities in Greene County, which were known as the Union Point Plant and the Bryan Scott Plant.

Movant had financial problems. An involuntary Chapter 7 case was filed against Movant on October 15, 2001. The Court entered an order for relief under Chapter 7 on November 8, 2001. The Court also entered an order converting Movant's Chapter 7 case to a Chapter 11 case on November 8, 2001.

Movant is liquidating its assets and will not reorganize as a going concern. Movant has sold its Union Point Plant.[1] Movant has employed Republic Textile Equipment Company to sell some of Movant's remaining assets.

Movant's equipment[2] and inventory were subject to ad valorem taxation. O.C.G.A. § 48–5–3 (1999). Movant was obligated to file ad valorem tax returns by April 1 of each year. Movant was to "return" all equipment and inventory that it owned as of January 1. O.C.G.A. § 48–5–10, –18(a) (1999 & Supp.2002). Movant was to return its equipment and inventory at fair market value. O.C.G.A. § 48–5–6 (1999). Movant's representative was to "solemnly swear" that the information on the return was true and correct. O.C.G.A. § 48–5–19 (Supp.2002).

---

**1.** The sale included the real estate, furniture, fixtures, and some of the machinery and equipment.

**2.** Equipment includes fixtures, furniture, office equipment, computer hardware, production machinery, tools, and certain other personal property.

Simply stated, Movant was obligated to file ad valorem tax returns by April 1. Movant was to return, at fair market value, the equipment and inventory that it owned on January 1.

Movant filed its 2001 ad valorem tax returns on May 10, 2001.[3] Movant's chief financial officer signed a Taxpayer's Declaration, asserting that the "true market value" of Movant's equipment was $8,866,450.[4]

Movant filed its 2002 ad valorem tax returns on March 13, 2002. Movant's president signed a Taxpayer's Declaration, asserting that the "true market value" of Movant's equipment was $8,679,443.

The Taxpayer's Declaration,[5] which is part of the ad valorem tax return, provides as follows:

## TAXPAYER'S DECLARATION

"I do solemnly swear that I have carefully read (or have had read) and have duly considered the questions propounded in the foregoing tax list, and that the value placed by me on the property returned, as shown by the list, is the true market value thereof; and I further swear that I returned, for the purpose of being taxed thereon, every species of property that I own in my own right or have control of either as agent, executor, administrator, or otherwise; and that in making this return, for the purpose of

being taxed thereon, I have not attempted either by transferring my property to another or by any other means to evade the laws governing taxation in this state. I do further swear that in making this return I have done so by estimating the true worth and value of every species of property contained therein."

The ad valorem tax returns require Movant to determine the "basic cost approach value" of its equipment. This requires Movant to determine the original cost and the economic life of the equipment. Movant then multiplies the cost times a depreciation factor.[6] The result is the basic cost value. Should Movant believe that the basic cost value does not reflect fair market value, then Movant may list its estimate of value under a column titled Taxpayer Returned Value.

Movant reported the basic cost value of its equipment for 2001 as $8,866,450 and for 2002 as $8,679,443. Movant did not list different values in the column titled Taxpayer Returned Value.

■ Movant, in the motion before the Court, contends that the fair market value of its equipment on January 1 of 2001 and January 1 of 2002 was $1,296,000. Movant urges the Court to determine the value of its equipment to be $1,296,000. Movant notes that this would reduce its ad valorem tax obligations. Movant relies upon section 505(a) of the Bankruptcy Code,[7] which

---

3. Movant's 2001 ad valorem tax returns were filed 40 days late.

4. Movant asserted that the fair market value of its equipment at the Bryan Scott Plant was $832,844 and at the Union Point Plant was $8,033,606. Movant does not contest the assessment value of its inventory.

5. The Taxpayer's Declaration is identical to the declaration required by O.C.G.A. § 48–5–19(a) (Supp.2002).

6. Ga. Comp. R. & Regs. 560–11–10–.08(5)(f)(4) (2002). The depreciation factor (or "composite conversion factor") decreases each year during the economic life of the equipment.

7. 11 U.S.C.A. § 505(a) (West 1993).

§ 505. Determination of tax liability

(a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any

provides, in relevant part, that the court may determine the amount or legality of any tax, whether or not previously assessed or paid.

Movant relies upon *Mocco v. City of Jersey City (In re Mocco)* [8] in which the Bankruptcy Court for New Jersey stated:

## I. Bankruptcy Court Authority to Review Tax Assessments

The bankruptcy court has authority to adjudicate tax assessments of real property pursuant to 11 U.S.C. § 505(a) . . . .

. . . .

Section 505 has been interpreted to permit the bankruptcy court to determine the amount of any tax, including real estate tax assessments. The ability of a bankruptcy court to determine any and all issues of tax liability of debtors, when there has been no prior determination by any state, judicial or judicial body, is well established in the Third Circuit. In determining such tax liabilities, section 505 grants a bankruptcy court broad discretionary powers.

A debtor's failure to meet state procedural requirements (such as payment of tax obligation) or the lapse of time between a tax year and the time of the filing does not limit the applicability of 11 U.S.C. § 505. In permitting assessments of real estate taxes where state law procedural requirements are not

met, the bankruptcy code through section 505, seeks to protect creditors from dissipation of an estate's assets. Such dissipation could result if creditors are bound by a tax judgment which a debtor, due to its ailing conditions, failed to contest.

Once beyond the state's *procedural* requirements, the bankruptcy court must give full faith and credit to the *substantive* law of the state to answer the ultimate question of whether the taxes are legally due and owing.

222 B.R. at 455.

■ Thus, the Court must look to state substantive law to determine the value of Movant's equipment for ad valorem tax purposes.

The Georgia Code provides, in part, as follows:

**48–5–1. Legislative intent.**

The intent and purpose of the tax laws of this state are to have all property and subjects of taxation returned at the value which would be realized from the cash sale, but not the forced sale, of the property and subjects as such property and subjects are usually sold except as otherwise provided in this chapter.

O.C.G.A. § 48–5–1 (1999).

Movant relies upon Georgia Department of Revenue Regulation 560–11–10–.08, which provides, in part, as follows:

> **(B)** any right of the estate to a tax refund, before the earlier of—
> **(i)** 120 days after the trustee properly requests such refund from the governmental unit from which such refund is claimed; or
> **(ii)** a determination by such governmental unit of such request.

11 U.S.C.A. § 505(a) (West 1993).

---

addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.
 (2) The court may not so determine—
 (A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title; or

**8.** 222 B.R. 440 (Bankr.D.N.J.1998). *See also City of Jersey City v. Mocco (In re Mocco),* 2002 WL 31160138 (D.N.J. Sept.30, 2002).

560–11–10–.08 PERSONAL PROPERTY APPRAISAL.

. . . .

(5) Valuation procedures.

The appraisal staff shall follow the provisions of this paragraph when performing their appraisals. Irrespective of the valuation approach used, the final results of any appraisal of personal property by the appraisal staff shall in all instances conform to the definition of fair market value in Code section 48–5–2 and this Rule.

(a) General procedures.

The appraisal staff shall consider the sales comparison, cost, and income approaches in the appraisal of personal property. The degree of dependence on any one approach will change with the availability of reliable data and type of property being appraised.

. . . .

2. Selection of approach.

With respect to machinery, equipment, personal fixtures, and trade fixtures, the appraisal staff shall use the sales comparison approach to arrive at the fair market value when there is a ready market for such property. When no ready market exists, the appraiser shall next determine a basic cost approach value. When the appraiser determines that the basic cost approach value does not adequately reflect the physical deterioration, functional or economic obsolescence, or other wise is not representative of fair market value, they shall apply the approach or combination of approaches to value that, in their judgement, results in the best estimate of fair market value. All adjustments to the basic cost approach shall be documented to the board of tax assessors.

Ga. Comp. R. & Regs. 560–11–10–.08(5)(a)(2).

The regulations also provide:

1. Liquidation sales.

The appraisal staff should recognize that those liquidation sales that do not represent the way personal property is normally bought and sold may not be representative of a ready market. For such sales, the appraisal staff should consider the structure of the sale, its participants, the purchasers, and other salient facts surrounding the sale. After considering this information, the appraisal staff may disregard a sale in its entirety, adjust it to the appropriate level of trade, or accept it at face value.

Ga. Comp. R. & Regs. 560–11–10–.08(5)(d)(1).

Douglas Henry Diamond testified on behalf of Movant. Mr. Diamond is a sales engineer with Republic Textile Equipment Company, the company that is liquidating most of Movant's remaining assets. Republic Textile is a brokerage company for textile equipment. Mr. Diamond also is vice president of Republic Associates, which is an appraisal company. Mr. Diamond testified that he has been in the appraisal business since 1994.[9]

Mr. Diamond testified that he first saw Movant's equipment in February of 2002. Mr. Diamond's appraisal report was admitted into evidence. The appraisal report lists a high value and a low value for Movant's equipment.[10] The appraisal report also lists the sales price for equipment that has been sold. Mr. Diamond testified that, in his opinion, the liquidation value of Movant's equipment is $1.2 million. Mr. Diamond testified that liquidation value is not the same as "fire sale

---

9. Transcript of Hearing held on August 27, 2002, p. 9 (hereinafter Tr. p. _____).

10. The high value is generally 15% to 20% more than the low value.

value." Mr. Diamond testified that Movant's equipment has not sold quickly and is part of a "specialized market." Mr. Diamond testified that he believes that Movant's equipment eventually will be sold for a total of $1.2 million.[11] Mr. Diamond testified that Movant is not under duress to sell its equipment because Movant is not having to pay warehouse or storage fees. Mr. Diamond testified that the bank is willing to wait for a higher price.[12]

Mr. Diamond testified that, in determining the value of Movant's equipment, he used the sales price for the equipment that has been sold. Mr. Diamond testified that he used the low values in his appraisal report for the remaining equipment because Movant is having a difficult time selling the equipment.[13]

Mr. Diamond testified that he had not been asked to offer an opinion as to the value of Movant's equipment for 2000 or 2001.[14] Mr. Diamond testified that the value of Movant's equipment would not have radically or drastically changed between January 1, 2001, and when he first saw the equipment in February of 2002.[15]

Mr. Diamond testified that he did not know the value of the computer equipment listed on Movant's ad valorem tax returns. Mr. Diamond testified that the computers were sold with the building prior to his employment.[16]

The Court notes that Mr. Diamond is a representative of the company that is liquidating Movant's equipment. He did not see the equipment in 2000 or 2001. Mr. Diamond testified that he has not been asked to offer an opinion as to the value of the equipment for 2000 or 2001. Movant's chief financial officer signed a Taxpayer Declaration in 2001 and Movant's president signed a Taxpayer Declaration in 2002, valuing the equipment substantially higher than the value testified to by Mr. Diamond. Movant's bankruptcy case was filed in October of 2001. Movant was liquidating its assets when Mr. Diamond first saw the equipment in February of 2002. From the evidence presented, the Court is not persuaded that Movant has carried its evidentiary burden for the Court to adjust the valuation that Movant reported in its 2001 and 2002 ad valorem tax returns. The Court is not persuaded by the testimony of Mr. Diamond. Thus, Movant's tax returns with their declarations of value must stand.

■ The Court now turns to the second issue raised in Movant's motion. Movant's inventory was eligible for a 100 percent freeport exemption [17] from ad valorem taxation.[18] Movant had to file its freeport application by April 1, 2001, to receive the full exemption for 2001. Movant did not file its freeport application until May 10, 2001. Thus, Movant was entitled to a

11. Tr. p. 11–13, 16.

12. Tr. p. 17.

13. Tr. p. 20.

14. Tr. p. 18–19.

15. Tr. p. 13–14.

16. Tr. p. 15.

17. "The purpose of the freeport exemption from ad valorem taxation, both as a constitutional provision and as to local referendum, was to promote and to keep local employment and economy high through maintaining or increasing manufacturing and commerce within Georgia counties." *Fulton County Tax Commissioner v. General Motors Corp.*, 234 Ga.App. 459, 507 S.E.2d 772, 777 (1998), *cert. denied*, (1999).

18. *See* O.C.G.A. § 48–5–48.2(d) (1999); Greene County Exhibit 2 (showing 100% county exemption).

freeport exemption of only 58.33 percent for 2001.[19]

Movant urges the Court to excuse the failure to timely file its freeport application. Movant urges the Court to allow it to claim the full exemption for 2001. Movant offers no reason for not timely filing its freeport application.

In *Rockdale County v. Finishline Industries, Inc. of Georgia*,[20] Finishline did not receive a freeport application from the county tax commissioner as it had in prior years. Finishline did not timely file a freeport application. Finishline, upon receipt of its tax bill in September, requested that the tax board accept its untimely freeport application. Finishline's request was denied. The Georgia Court of Appeals stated:

> The burden of timely filing the application for Freeport exemption lies with Finishline. Finishline's failure to satisfy its burden of proving that it timely filed for such exemption, precludes its entitlement thereto. Applications for Freeport exemptions and personal property report forms are required by law to be furnished by the tax commissioner and filed by the date on which the tax commissioner closes the books. See OCGA § 48-5-48.1(a). This Court strictly enforces the required filing deadline. . . . Additionally, although the County is required to *furnish* the report forms, the tax code does not require that the County mail the report forms to taxpayers, or to insure delivery thereof if mailed. The County is required only to make such forms available. There is no evidence in the record that the forms were not available to Finishline by requesting them from the County. . . .

. . . Finishline failed to comply with its statutory duty and, therefore, is not entitled to a Freeport tax exemption for tax year 1996.

518 S.E.2d at 722.

■ "Since the [freeport exemption] statute provides for an exemption from taxation, it must be strictly constructed." *Gwinnett County Board of Tax Assessors v. Makita Corp. of America*, 218 Ga.App. 175, 460 S.E.2d 538, 539 (1995), *cert. denied*, (corporation deposited freeport application into corporation's mailbox on last day to file application, application was received by county tax commissioner five days after deadline, corporation not entitled to freeport exemption).

In *Committee for Better Government v. Black*,[21] the county had accepted untimely freeport applications in prior years. The Georgia Court of Appeals stated:

> There is no express authority to grant an extension of time or to ignore the statutory waiver of exemption for failing to make a timely application.
>
> . . . .
>
> We must disagree with the [lower] court's holding that the Board was authorized to extend the period of time for accepting applications beyond the date on which the books for the return of taxes in the county were closed. State law establishes such date as a mandatory deadline and gives a local board of tax assessors no authority to extend it. Under the law, we thus hold that the defendants acted improperly in allowing untimely applications for freeport exemptions for 1993.

453 S.E.2d at 774.

Turning to the case at bar, the Court can find no statutory basis under state law

---

**19.** O.C.G.A. § 48-5-48.1(a), (c)(2)(B) (1999).

**20.** 238 Ga.App. 467, 518 S.E.2d 720 (1999), *cert denied.*

**21.** 216 Ga.App. 173, 453 S.E.2d 772 (1995), *cert. denied.*

to excuse an untimely filing of a freeport application. Movant has cited no legal authority under state law to support its position. The Court also notes that Movant has not offered any reason for not timely filing its freeport application.

The Court can only conclude that Movant cannot be excused from its failure to timely file a freeport application.

An order in accordance with this memorandum opinion will be entered this date.